Ronald Wayne BREWER, Appellant,

v.

STATE of Iowa, Appellee.

No. 88–873.

Supreme Court of Iowa.

July 19, 1989.

Philip B. Mears and Jean C. Lawrence of Mears, Zimmerman & Mears, Iowa City, for appellant.

Thomas J. Miller, Atty. Gen., and Ann E. Brenden and James Kivi, Asst. Attys. Gen., Denise Riley, Student Legal Intern, for appellee.

Considered by HARRIS, P.J., and LARSON, NEUMAN, SNELL, and ANDREASEN, JJ.

NEUMAN, Justice.

This is an appeal from postconviction rulings that have denied appellant Ronald Brewer relief from his 1975 murder conviction. We affirm.

In January 1975, Brewer was an inmate at the men's reformatory at Anamosa, Iowa. While incarcerated, he gained the friendship of a guard named Herbert Pennock. Pennock frequently accompanied Brewer on authorized outings beyond the prison walls.

Such an outing occurred the evening of January 29, 1975. Brewer was scheduled to teach a first-aid class at the Anamosa High School. Pennock was to provide the transportation. More importantly, Pennock knew Brewer viewed the event as a chance to escape.

Part of Brewer's plan was to take a prison employee, Patricia Edwards, with him. In order to help Brewer "ward off" Patricia's husband, Pennock furnished Brewer a rifle and ammunition. On the night of the class, Pennock dropped off Brewer at the Edwards' home before proceeding to the high school. Brewer later returned to the high school to tell Pennock that he had shot the Edwards. Pennock then drove Brewer to Dubuque to make his getaway.

Pennock advised prison authorities that he had been kidnapped by Brewer and forced to aid his escape. It was not until some months later that Pennock admitted his role in this escapade. At Brewer's trial, Pennock acknowledged that he was given immunity from prosecution before he would concede his involvement.

At trial, defense counsel developed an alibi theory that suggested Brewer had already escaped to Dubuque by the time the Edwards were slain. They painted Pennock as a liar, and attempted to convince the jury that he had nothing to lose by concocting the story described above. They suggested it was as likely that Pennock, or someone else, had committed the murders. On the strength of Pennock's testimony, however, and circumstantial evidence placing Brewer at the scene of the crime, the jury found Brewer guilty of first-degree murder. We upheld the conviction on direct appeal. *State v. Brewer*, 247 N.W.2d 205, 208 (Iowa 1976).

Based on alleged constitutional infirmities preserved at trial, Brewer sought habeas corpus relief in federal court. That action was dismissed because of his failure to exhaust state remedies. He then filed the present application for postconviction relief in accordance with Iowa Code chapter 663A (1987).

Brewer's postconviction action advances three principal grounds for reversal of his conviction. First, he contends that newly discovered evidence and a change in the law merit re-evaluation of his original claim that the statutory exclusion of persons aged sixty-five and over from his jury panel violated his sixth and fourteenth amendment rights to a fair and impartial jury. Second, he asserts that documents discovered posttrial demonstrate the State's failure to reveal exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Finally, he claims prejudice resulting from several instances of alleged ineffective assistance of trial and appellate counsel.

■ All three grounds for relief were rejected by the trial court, the first by way of summary judgment and the latter two after trial on the merits. Because of the

constitutional questions involved in all three, our appellate review is de novo. *Hinkle v. State,* 290 N.W.2d 28, 30 (Iowa 1980).

■ I. *Impartial Jury.* When Brewer was tried in 1975, Iowa Code sections 607.2 and 609.2 (1975), taken together, exempted persons aged sixty-five and older from serving as jurors. Brewer challenged the composition of his jury panel, claiming that such a systematic and intentional exclusion of an identifiable group of persons deprived him of his constitutional right to be tried by a jury representing a cross section of the community.

We rejected Brewer's contention on direct appeal. *Brewer,* 247 N.W.2d at 208–10. Our decision was based on a survey of state and federal authority that revealed broad discretion vested in the states to prescribe juror eligibility requirements. *See id.* at 209–10. Notably, we discerned no criticism of statutory provisions that included maximum age restrictions as a means of achieving a panel of competent jurors. *Id.* at 210. We concluded that classification of jurors by age, as well as other factors, struck a reasonable balance between the State's interest in a defendant's right to a fair trial and its concern for citizen-jurors' varying responsibilities. *Id.* Given this "rational basis for [the State's] special exclusion of persons over sixty-five," and Brewer's lack of proof that the excluded class "has any special perspective not attainable from the balance of the community," we found no merit in his contention that his jury panel did not represent the required cross section of the community. *Id.*

In support of his claim for postconviction relief, Brewer urged the trial court's consideration of new evidence bearing on the special perspective held by persons over age sixty-five, and refinements in the United States Supreme Court's interpretation of the sixth amendment's fair-cross-section-of-the-community requirement. Like the trial court, however, we are convinced that neither argument sustains Brewer's request for a new trial.

■ In order to prevail on a claim of newly discovered evidence, a postconviction applicant must show:

(1) the evidence in question could not have been discovered before judgment in the exercise of due diligence; (2) the evidence is material to the issue and not merely cumulative or impeaching; and (3) its admission would likely change the result if a new trial were granted.

*Stanford v. Iowa State Reformatory,* 279 N.W.2d 28, 32–33 (Iowa 1979).

The first factor defeats Brewer's claim. Brewer's "new evidence" consists of the affidavits of two experts expressing their respective views that persons over age sixty-five comprise "a distinct, cognizable group in American society," the majority of whom are "physically well ... [and] mentally able to serve on jury duty." Neither the affiants, nor Brewer, assert that the data and conclusions contained in the affidavits could not have been discovered with due diligence at the time of Brewer's trial. In fact, the more detailed of the two documents claims to be premised on studies published in 1975 and earlier. Clearly, such proof is insufficient to justify relief under section 663A.2(4).

■ Alternatively, Brewer argues that *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), modified the standard to be applied in fair-cross-section challenges, and that this "new law" should be applied retroactively to grant him an opportunity to relitigate the issue. The thrust of Brewer's argument is that *Duren* rejected the rational basis test analysis we applied in *Brewer* and, in its place, called for a showing "that a significant state interest be manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Duren,* 439 U.S. at 367–68, 99 S.Ct. at 670, 58 L.Ed.2d at 589. We are convinced for at least two reasons, however, that Brewer is not entitled to the retroactive benefit of this "significant State interest" test under the facts of this case.

Significantly, *Duren* and its predecessor *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), involved jury service exemption for a class of persons comprising over half of the forum counties' populations—women. In *Taylor*, the court held that the systematic exclusion of women from jury service violated the defendant's sixth amendment right to a jury drawn from a fair cross section of the community. *Taylor*, 419 U.S. at 537, 95 S.Ct. at 701, 42 L.Ed.2d at 702. The holding was premised on the obvious conclusion that women as a class are numerous and distinct from men. *Id.* at 531, 95 S.Ct. at 698, 42 L.Ed.2d at 698. *Duren* echoed the same sentiment four years later, modifying *Taylor* only insofar as it clarified the following three-part test by which a defendant may establish a prima facie violation of the fair-cross-section requirement:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 587.

While rejecting jury panels that were "almost totally male," the court in *Taylor* reserved to the states the right to "prescribe relevant qualifications ... and ... reasonable exemptions so long as it may be fairly said that the jury list or panels are representative of the community." *Taylor*, 419 U.S. at 537–38, 95 S.Ct. at 701, 42 L.Ed.2d at 702. It is this latter standard that we applied in *Brewer*, 247 N.W.2d at 209. Neither *Taylor* nor *Duren* suggest that age qualifications, as distinct from gender-based exemptions, would result in the exclusion of a "distinctive" and numerous group of persons to the end that the resulting jury panel would not be "fair and reasonable in relation to the number of such persons in the community." *Duren*, 439 U.S. at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 586–87. Nor does the record before us

support a factual basis for such a conclusion.

Even assuming, *arguendo*, that the court in *Brewer* should have applied *Duren*'s "significant state interest" test rather than a rational basis test to measure the constitutionality of age-based juror restrictions, we would still be left with the question whether *Duren*'s higher standard should be given retroactive application on postconviction review. In a strikingly similar case, the United States Supreme Court recently held that new constitutional rules of criminal procedure generally should not be applied retroactively to cases on collateral review. *See Teague v. Lane*, —— U.S. ——, ——, 109 S.Ct. 1060, 1075–78, 103 L.Ed.2d 334, 356–60 (1989). We concur in the Court's conclusion and adopt it here.

Like the present case, Teague's fair-cross-section challenge (based on race) had been rejected by the Illinois Supreme Court in 1982 and then, in light of the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), he reasserted it by way of habeas corpus in federal court. *Teague*, —— U.S. at ——, 109 S.Ct. at 1065–67, 103 L.Ed.2d at 344–46. On appeal from the denial of habeas corpus relief, the Supreme Court drew a bright line between the need for evenhanded justice that compels the retroactive application of newly announced constitutional principles to similarly situated defendants awaiting appeal, and the negative consequences flowing from repeated collateral attacks on judgments that were constitutionally sound when rendered. *See id.* at ——, 109 S.Ct. at 1072–75, 103 L.Ed.2d at 352–56.

Prompted by principles of finality that are at the foundation of the criminal laws' deterrent effect, the Court reasoned that new rules should not be applied retroactively to cases on collateral review unless the change: (1) places certain types of individual, private conduct beyond the ability of lawmakers to proscribe, or (2) creates a "watershed" rule of criminal procedure implicating issues of fundamental trial fairness. *Id.* at ——, 109 S.Ct. at 1075–76, 103 L.Ed.2d at 356–57. The Court then held:

Because the absence of a fair cross section on the jury venire does not undermine the fundamental fairness that must underlie a conviction or seriously diminish the likelihood of obtaining an accurate conviction, we conclude that a rule requiring that petit juries be composed of a fair cross section of the community would not be a "bedrock procedural element" that would be retroactively applied under the second exception we have articulated.

*Id.* at ——, 109 S.Ct. at 1077, 103 L.Ed.2d at 359; *accord Daniel v. Louisiana,* 420 U.S. 31, 32, 95 S.Ct. 704, 705, 42 L.Ed.2d 790, 792 (1975) (refusing to apply *Taylor* retroactively). Applying this same reasoning to the case before us, we find no error in the trial court's rejection of Brewer's claim that *Duren v. Missouri* announced new law that should be retrospectively applied to furnish Brewer a new trial.

II. *The "Brady" Claim.* Brewer's second assignment of error centers on the deal struck between the State and its star witness, Herbert Pennock. Brewer claims that the State failed to fully disclose the extent of the deal and thereby violated Brewer's due process right to exculpatory evidence under *Brady v. Maryland,* 373 U.S. 83, 87–88, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215, 218 (1963). The State counters that there was no suppression here because Brewer knew, and used at trial, the same information he now claims was suppressed.

■ Several requirements attend any *Brady* challenge. First, the prosecution must have withheld evidence from the defendant; second, the evidence must be favorable; and third, the evidence must be "material," that is, "such that there is a reasonable probability its disclosure would have changed the outcome." *State v. Schatz,* 414 N.W.2d 840, 841 (Iowa App. 1987) (citing *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3382, 87 L.Ed.2d 481, 494 (1985)); *see also State v. Anderson,* 410 N.W.2d 231, 232–34 (Iowa 1987). A defendant asserting a *Brady* violation must shoulder the burden of establishing proof of materiality. *Anderson,* 410 N.W.2d at 235.

■ The exculpatory evidence claimed to have been suppressed is a BCI memorandum—dictated posttrial—that verifies the details of Pennock's "deal" as follows:

Subject arrested and charged with following felonies:

1. Suffering a Life Prisoner to escape.

2. Perjury.

3. Illegal possession of a firearm by a felon.

Subject given immunity by the prosecution and all these charges dismissed on condition that subject testify against Ronald Wayne Brewer in Homicide charge.

Brewer concedes the trial testimony established that Pennock had certain State charges against him dismissed, and that he had received immunity. Brewer claims, however, that the State never divulged the *quid pro quo* evident in the BCI memo; that is, that the immunity was specifically given in exchange for Pennock's testimony against Brewer.

Brewer contends that if the defense could have established this *quid pro quo* for the jury, it would have seriously damaged Pennock's credibility. He points out that the consequences for refusing to testify after a deal conditional on giving testimony would include refiling of charges; for simple immunity and dismissal of charges, the maximum consequence would be a thirty-day jail sentence for contempt. Thus Brewer claims the deal gave Pennock a large incentive to testify against Brewer as he did, and that the defense and jury should have been given this information in order to accurately assess Pennock's credibility.

There may be merit in the fine line Brewer has drawn between what he knew in advance of trial and what was later revealed by the State's memo. But we think he is relying on a distinction without a material difference in this case.

As noted by the State, the record is replete with evidence that the defense had a

good understanding of the scope of Pennock's deal and made good use of it at trial. The transcript of pretrial proceedings quotes Brewer's counsel as being aware that Pennock had "been granted immunity in return for his testimony against Mr. Brewer." Counsel used that knowledge in his opening statement:

So what did [the State] do? They said, well, Mr. Pennock, that's simple enough, we will assure you that anything you say won't matter any because you are not ever going to be charged. That's what they have done. They have made a plea bargain that is second to none probably in this State.

As a preface to his own testimony, Pennock told the jury he was testifying under an order granting him immunity from a charge of perjury and suffering a life prisoner to escape. The defense pursued Pennock's understanding of the deal at length on cross-examination. The State, in its closing argument, conceded that Pennock was "probably not a very nice guy" and had testified only because of the grant of immunity. The defense then followed with the argument that Pennock was only now "telling the truth" because the State had "virtually put [Pennock] beyond the clutches of the law" and

last, but far from least, he got the ultimate governmental immunity for everything he said here, governmental immunity for all this factual situation, a deal bought, paid for and delivered to the State not for money, but for the more valuable coin, a whitewash of his crimes and those of his family forever.

We are at a loss to see how defense counsel could have made better use of this evidence as a tool to impeach the State's chief witness had the "deal" set out in the BCI memo been reduced to writing and revealed before trial. Even assuming, for the sake of argument, that some nuance of the deal was suppressed by the State, no due process violation occurs unless the suppressed evidence is material to defendant's guilt. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218. Evidence is "material," for *Brady* purposes, only if the

defendant shows a reasonable probability that if the evidence had been produced, the outcome of the trial would have been different. *Anderson,* 410 N.W.2d at 233. Brewer has not met that standard here. Viewing the totality of the circumstances, we are persuaded the district court was correct in denying a new trial on this ground.

III. *Ineffective Assistance of Counsel.* The rules guiding our review of Brewer's ineffectiveness claims are well established. Fundamentally, Brewer must show that counsel "failed to perform an essential duty," and that "prejudice resulted therefrom." *State v. Miles,* 344 N.W.2d 231, 233–34 (Iowa 1984); *see also Nims v. State,* 401 N.W.2d 231, 234 (Iowa App. 1986). Brewer bears the burden of proof on both of these requirements and must establish them by a preponderance of the evidence. *Taylor v. State,* 352 N.W.2d 683, 685 (Iowa 1984). To prove failure of an "essential duty," Brewer must overcome a presumption that counsel is competent, and demonstrate that under the entire record and totality of the circumstances, counsel's performance was not within the range of normal competency. *Taylor,* 352 N.W.2d at 685; *Henderson v. Scurr,* 313 N.W.2d 522, 524 (Iowa 1981); *Nims,* 401 N.W.2d at 233. Because a petitioner like Brewer is not entitled to perfect representation, we will not reverse where counsel has made a reasonable decision concerning trial tactics and strategy, even if such judgments ultimately fail. *Fryer v. State,* 325 N.W.2d 400, 413–15 (Iowa 1982); *Nims,* 401 N.W.2d at 233.

As for proof of prejudice, Brewer must show that counsel's failure worked to his substantial and actual disadvantage, to the end that

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674, 699 (1984).

Brewer raised four claims of ineffective assistance of counsel before the postconviction trial court. All were rejected by the court. Only two merit our brief consideration here: (1) counsel's failure to preserve error on the prosecutor's alleged comment on Brewer's silence; and (2) counsel's failure to request an accomplice instruction. We consider the arguments in turn.

■ A. *Prosecutor's remarks.* As a general rule, a prosecutor's comment on the defendant's failure to testify violates a defendant's due process rights. *Anderson v. Nelson,* 390 U.S. 523, 523–24, 88 S.Ct. 1133, 1134, 20 L.Ed.2d 81, 83, *reh'g denied,* 391 U.S. 929, 88 S.Ct. 1812, 20 L.Ed.2d 670 (1968). In Iowa, we view the issue as being whether the "language used by the prosecutor, in context, would 'naturally and necessarily' be understood by a jury to be a comment on the failure of the accused to testify." *State v. Bishop,* 387 N.W.2d 554, 563 (Iowa 1986); *State v. Taylor,* 336 N.W.2d 721 at 727 (Iowa 1983).

At trial, Brewer stood on his right to remain silent. His counsel asked the court to instruct the jury regarding his right to do so free from adverse inference. The prosecutor then made the following statement in closing argument:

> You will be instructed that not only is the Defendant presumed to be innocent, he also has his constitutional right not to testify, and you cannot take that to mean anything. You can't hold that against him. That's the law and— ...—that's the instruction.

On rebuttal, the prosecutor added:

> You know, I don't like Mr. Pennock, I don't like anything about it, but at least he testified as to what the facts and circumstances were. He testified and you had an opportunity to hear him testify.

Brewer claims that these statements, in combination with the prosecutor's repeated suggestion that only the defendant knew what really happened, amounts to unlawful comment on Brewer's right to remain silent. He claims his counsel's failure to object or move for mistrial on this ground amounted to ineffective assistance of coun-

sel. *See Brewer,* 247 N.W.2d at 215 (error not preserved for appeal on prosecutor's comments). The State argues that the first remark was merely an accurate statement of the law and the second was fair response to defense counsel's closing argument and, therefore, no claim for ineffective counsel can be predicated on failure to preserve error. We agree.

■ The prosecutor's first comment was no more than an affirmative statement of the law that would shortly be repeated by the trial court. No unfairness meriting objection appears.

■ The rebuttal statements, though troublesome when taken out of context, strike us as invited and fair comment in light of the double-barreled thrust of defense counsel's argument: the alleged failure by the State to prove essential facts and the assault on Pennock's credibility.

In *State v. Bishop,* we found no due process violation where a prosecutor made comparable remarks in response to defendant's attack upon a void in the State's evidence. *Bishop,* 387 N.W.2d at 562–64. We reasoned that a prosecutor may make such statements when a defendant's strategy is to put the State's case and witnesses "on trial," so long as the prosecutor's remarks do not "shift the burden of proof or refer to the defendant's failure to testify." *Id.* at 564. Our review of the record reveals no such shifting of burdens here. Moreover, the comments were not directed at Brewer's failure to testify, but at general prosecutorial frustration over developing evidence when the crime scene is controlled by the perpetrator of the crime. The assignment is without merit.

■ B. *Accomplice instruction.* As noted earlier in this opinion, the State's case—conveyed through the testimony of Herbert Pennock—established that Pennock purchased the murder weapon, gave it to Brewer, drove Brewer to the Edwards' residence, and later drove Brewer to Dubuque to facilitate his escape. Brewer's defense rested on the alibi that he was already in Dubuque by the time someone

(such as Pennock) shot and killed the Edwards.

Given these two scenarios, Brewer contends his counsel were ineffective for having refused to request an accomplice instruction. Had they done so, the jurors would have been instructed that they could not convict Brewer based on Pennock's testimony alone. Because he views the remaining corroborative evidence as very weak, Brewer claims a reasonable probability that the outcome of the trial would have been different had the accomplice instruction been given.

Preliminarily, we are unable to agree with Brewer's assessment of the corroborating evidence. Without further lengthening this opinion by detailing that evidence here, the record reveals numerous pieces of persuasive physical and circumstantial evidence corroborating Pennock's version of the evening's events. The evidence placed Brewer at or near the crime scene when shots were heard; other witnesses observed a man resembling Brewer running from the scene with a rifle at his side shortly thereafter. Contrary to Brewer's assertion, we find the corroborative evidence strong, not minimal.

More importantly, as revealed by Brewer's trial counsel at his postconviction hearing, their election not to pursue an accomplice theory was a matter of deliberate trial strategy. They testified that no accomplice instruction was requested because they thought it would seriously weaken their best theory of defense, alibi. As one of these experienced trial counsel opined, a jury was unlikely to believe a theory of defense that attempted to "ride two horses."

 Counsel need not urge the giving of every possible instruction to display competency, even where an instruction would otherwise be available. *Wycoff v. State*, 382 N.W.2d 462, 472 (Iowa 1986); *Frank v. State*, 376 N.W.2d 637, 640–41 (Iowa App.1985). This is particularly true where the decision is based on trial strategy. *Wycoff*, 382 N.W.2d at 472.

Here, counsel's failure to request an accomplice instruction was calculated to effectuate a reasonable trial strategy. That strategy was to avoid the duplicitous argument that defendant was not there, but if he was, he had an accomplice. Even though this strategy was ultimately unsuccessful, we cannot say that counsel's decision breached an essential duty that in any way prejudiced the defendant. The court correctly rejected this claim of ineffective assistance.

For all of the foregoing reasons, we affirm the trial court's dismissal of Brewer's postconviction action on its merits.

AFFIRMED.