**STATE of Iowa, Appellee,**

v.

**Robert Ray DOUGLAS, Appellant.**

No. 91–41.

Supreme Court of Iowa.

May 13, 1992.

Linda Del Gallo, State Appellate Defender, and B. John Burns, Asst. State Appellate Defender, for appellant.

Bonnie J. Campbell, Atty. Gen., Thomas S. Tauber, Asst. Atty. Gen., Fred McCaw, County Atty., and Christine O'Connell Corken, Asst. County Atty., for appellee.

Considered by McGIVERIN, C.J., and CARTER, NEUMAN, SNELL, and ANDREASEN, JJ.

SNELL, Justice.

Robert Ray Douglas was charged with one count of murder in the first degree and two counts of attempted murder. A jury found him guilty of murder in the first degree and assault with intent to inflict serious injury on count two. He was acquitted on count three. Douglas has appealed to this court. Issues are raised regarding effectiveness of counsel in not objecting to instructions, media interference with attorney client consultations, evidentiary rulings, and the submission of lesser-included offenses. We affirm in part and reverse in part with directions.

I. *Background Facts.*

Douglas and his wife, Linda Douglas, were driving from the east coast to Washington state. They stopped at Maquoketa, Iowa, and entered Skeffington's Jack and Jill grocery store. While shopping, Linda Douglas was observed by a store employee placing a package of lunch meat in her purse. They paid for a quart of milk and a loaf of bread and left the store. Three employees followed them to their car where Linda Douglas was asked to return to the store. Robert Douglas responded by saying they were leaving, pointed a handgun at the three employees and asked, "Do you have a problem with this?" The employees backed up and proceeded toward the store while Douglas and Linda Douglas got into their car and drove out of the parking lot. At that moment, Craig Jackson, a Maquoketa city police officer, drove into the lot. He was immediately advised of the situation and that Douglas was armed. He followed the Douglas car and radioed for assistance from other officers.

A prolonged chase ensued at speeds above eighty-five miles per hour, which ultimately included five state trooper cars, a deputy sheriff's car, and two Maquoketa police cars. Numerous attempts to stop the Douglas car failed despite hand signals by the officers to pull over, sirens, and flashing red lights on their vehicles. Trooper Virgil Stammeyer pulled his patrol car abreast of the Douglas car three times motioning him to pull off the road and stop. The third time Douglas fired his handgun twice at Trooper Stammeyer. Two bullets came through the windshield striking him in the shoulder and throat. Trooper Stammeyer was shot eleven days short of his planned retirement, recovered from his injuries, and retired. Trooper Jeffrey Cooper saw that Trooper Stammeyer had been shot and radioed this fact to the other officers. He then initiated bumping and ramming actions to force Douglas's car off the road. This finally resulted in spinning the Douglas car into a pickup truck that had entered an intersection at the Maquoketa city outskirts. The Douglas vehicle stopped.

Matthew Stammeyer, a state trooper and son of Trooper Virgil Stammeyer, participated in the actions to stop the Douglas car. Because he was on a different radio frequency, he was unable to establish radio

contact with other troopers and was unaware that Douglas was armed and had shot his father. Upon arriving at the place where the Douglas car had stopped, Trooper Stammeyer yelled at Douglas to stop. He then saw Douglas raise his hand to the back of Linda Douglas's head and discharge his gun. She died as a result.

Trooper Stammeyer yelled for Douglas to stop again. This time Douglas moved his right hand forward in the trooper's direction with the weapon in his hand. Trooper Stammeyer then fired his revolver six times into the vehicle wounding Douglas. Douglas followed an order to throw his gun out the window. Two other troopers removed Douglas from the car, and he was taken to the hospital.

## II. *Admissibility of Subsequent Police Conduct.*

■ At the crash scene, fifteen police vehicles were assembled. Douglas characterizes this and the chase of Douglas's car by seven police cars as police panic that culminated in the use of excessive force. The argument is that the police conduct generated a fear in Douglas that caused him to act in self defense. At trial, he sought to introduce evidence to support this theory that purported to show the aggressive character of the police. We permit evidence under Iowa Rule of Evidence 404(a)(2)(A) of a pertinent trait of character of the victim of a crime offered by an accused. Citing this rule, Douglas offered evidence of police conduct that occurred after the arrest of Douglas. The evidence showed that several police officers saw a black man sitting in his car bearing Ohio license plates in a church parking lot. They approached him with guns drawn, including shotguns, and forced him out of the car and down on the pavement. It turned out that he was a retired military man who was lost and was waiting for someone to come and get him. The trial court refused to allow presentation of this evidence. Our review of a ruling on the admissibility of evidence is for abuse of discretion. *State v. Myers,* 382 N.W.2d 91, 93 (Iowa 1986).

In *State v. Dunson,* 433 N.W.2d 676, 679–81 (Iowa 1988), we adopted the rule allowing evidence of subsequent conduct as well as prior conduct to show character traits. At the same time, we cautioned that the district court must still exercise its discretion as to its admissibility under Iowa Rule of Evidence 403. In the instant case, the court properly excluded the proffered testimony as being not relevant. Only one police officer participated in both events so that the conduct exhibited at the church parking lot would not reflect the conduct of different officers involved in the car chase and arrest of Douglas. Further, under rule 403, the prejudicial effect outweighed any probative value of this evidence.

## III. *Ineffective Assistance of Counsel Claim.*

Douglas pleaded as part of his defense that he was entitled to the benefit of the diminished responsibility defense. This defense was recognized in *State v. Gramenz,* 256 Iowa 134, 126 N.W.2d 285 (1964). This common law doctrine "permits proof of defendant's mental condition on the issue of defendant's capacity to form a specific intent in those instances in which the State must prove defendant's specific intent as an element of the crime charged." *Id.* at 139, 126 N.W.2d at 288. The mental condition claimed by defendant was that he suffered from epilepsy.

Dr. Mark Fortson testified, being called as a witness for defendant, on the nature of epilepsy. Practicing neurology, he specializes in treatment of disorders of the nervous system of the brain. He testified that there are many different kinds of epileptic seizures that are caused when neurons, which are cells that control brain function, get out of control. Evidence was presented to the jury that Douglas was taking medication for an epileptic condition he had had for many years.

■ The trial court submitted an instruction on diminished responsibility on the issue of specific intent to kill Linda Douglas. As an alternative to this charge of first-degree murder, the court instructed that defendant could be convicted of first-

degree murder if, as an element thereof, he was participating in the offense of first-degree robbery or attempted murder. This alternative did not include an instruction on specific intent or diminished responsibility. Douglas claims trial counsel was ineffective in failing to object to these omissions in instructing on alternative B. He argues that specific intent is required as an element of the crimes of robbery and attempted murder, the underlying felonies in the murder charge of alternative B. As such, the diminished responsibility defense is as applicable to the felony murder charge of alternative B as to the specific intent required by alternative A to prove first-degree murder. Our review of this constitutional claim is de novo on the totality of the circumstances. *Brewer v. State*, 444 N.W.2d 77, 79–80 (Iowa 1989).

█ Two reasons appear persuasive to reject Douglas's assertion of error. First, the expert testimony by Dr. Fortson belies the suggestion of a nexus between Douglas's acts and his condition of epilepsy. Dr. Fortson stated that an epileptic has no physical or voluntary control over what is happening during a seizure. He testified "if a person has control that almost excludes the possibility that it's a seizure." Evidence was presented that Douglas may have experienced two seizures after being taken to the hospital to treat his injuries. However, there is no evidence that any seizure activity occurred during the car chase; in fact, the length of time Douglas drove his car in an attempt to elude the police is nearly irrefutable evidence that he was in voluntary control of his actions. The defense of diminished responsibility based on Douglas's epilepsy lacked evidentiary foundation.

Second, we believe Douglas received the benefit of this defense as to the felony murder count through other instructions by the court. In jury instructions thirty-two and thirty-five, the jury was told that, with respect to attempted murder, the State had to prove that Douglas acted with specific intent to cause death. Jury instruction twenty-three instructed that to convict on the charge of first-degree robbery, the

State had to prove that Douglas acted with the intent to commit a theft. In *State v. Miles*, 344 N.W.2d 231 (Iowa 1984), we adopted the standard, now expressed in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for assessing ineffective assistance of counsel claims. Under that standard, we find a lack of sufficient prejudice to Douglas's presentation of the diminished responsibility defense to require any consideration of counsel's effectiveness regarding this issue.

### IV. *Submission of Lesser–Included Offenses.*

Error is asserted in the court's submission of lesser-included offenses. Douglas was charged with first-degree murder and attempted murder. Although not so charged, the lesser-included offenses of second-degree murder, voluntary manslaughter, and assault with intent to inflict serious injury were submitted to the jury for determination of guilt. Douglas objected to the submission of these lesser-included offenses as being factually unsupported by the record. He argues that to submit these charges that were not named in the information violates his constitutional right to be apprised of the charges against him. Our review is for errors of law. Iowa R.App.P. 4.

We have established criteria for submission of lesser-included offenses in *State v. Jeffries*, 430 N.W.2d 728 (Iowa 1988). There we adopted a strict statutory elements test as modified that retained the legal test previously applied but abandoned the factual basis test for most included offenses. The rule was also retained in *Jeffries* that a defendant may expressly waive a lesser-included offense instruction. *Id.* at 737. Over the objection by Douglas, who specifically waived all lesser-included offense submissions, the trial court submitted them. The prosecutor objected to the submission of many lesser-included offenses but did not object to the submission of the voluntary manslaughter charge. Our statutory law makes voluntary manslaughter an included offense for murder

in the first or second degree. *See* Iowa Code § 707.4.

■ Without deciding whether it was error to submit the lesser offense of voluntary manslaughter, we find that reversible error was not here committed. Douglas was convicted of the first-degree murder of Linda Douglas. The general rule applies that when a defendant is convicted of a greater offense he cannot complain of the fact the jury was permitted to consider his guilt of a lesser offense. *State v. Hilleshiem*, 305 N.W.2d 710, 717–18 (Iowa 1981); *Everett v. Brewer*, 215 N.W.2d 244, 248 (Iowa 1974).

■ A different result occurs regarding the submission of the lesser offense with the charge that Douglas attempted to murder Trooper Virgil Stammeyer. The hurdle not passed by the State in this assignment of error is that the submission of the lesser-included offense did not prejudice Douglas. Both the defense and the State objected to the submission of the offense of assault with intent to inflict serious injury. Nevertheless, the trial court submitted the lesser offense. The jury acquitted Douglas of the attempted murder charge and convicted him on the lesser offense.

We have held that assault with intent to inflict serious injury is an included offense in a charge of attempted murder. *State v. Powers*, 278 N.W.2d 26, 28 (Iowa 1979). In *State v. Wallace*, 475 N.W.2d 197 (Iowa 1991), we held that where the State does not object to the defendant's waiver of a lesser-included offense instruction, as was true in the instant case, it is reversible error to submit the included offense. *Id.* at 202. A defendant is entitled to his "all or nothing" defense. We said in *Wallace:*

> Fundamental fairness dictates that Wallace should have the benefit of his "all or nothing" defense which he urged in the first trial. Retrial on the lesser-included offense of which he was convicted would deny Wallace this benefit. In addition, the State cannot complain because it could have avoided this result in the first place.

*Id.* at 202. Double jeopardy prohibits retrial on the greater offense of attempted murder because the jury acquitted Douglas of it. *See* U.S. Const. amends. V, XIV; *State v. Gowins*, 211 N.W.2d 302, 303 (Iowa 1973) (5th amendment applicable to state prosecution); *Poland v. Arizona*, 476 U.S. 147, 152 n. 2, 106 S.Ct. 1749, 1753 n. 2, 90 L.Ed.2d 123, 130 n. 2 (1986) ("a defendant charged with [a greater offense] but only convicted of [a] lesser-included offense ... has been acquitted of the greater charge for purposes of the Double Jeopardy Clause"). Had the State objected to the waiver by the defendant of the lesser-included offense submission, it would not have been error to submit it. *See State v. Greer*, 439 N.W.2d 198, 200 (Iowa 1989). We reverse and remand with directions to dismiss the charge of attempted murder.

## V. *Media Interference with Attorney–Client Consultations.*

■ The final assignment of error is that the placement of media microphones at the counsel table violated Douglas's due process rights and his right to effective assistance of counsel. U.S. Const. amends. VI, XIV. Our review is de novo on the totality of the circumstances. *State v. Gregg*, 464 N.W.2d 431, 432 (Iowa 1990).

We have granted expanded media coverage by our rules. Broadcasting, televising, recording, and photographing are permitted in the courtroom during sessions of the court under certain conditions. *See* Iowa Code of Judicial Conduct, Canon 3B(2). Subparagraph (f) provides:

> There shall be no audio pickup or broadcast of conferences in a court proceeding between attorneys and their clients, between co-counsel, between counsel and the presiding judge held at the bench or in chambers, or between judges in an appellate proceeding.

An exception to subparagraph (f) is provided in subparagraph (h) as follows:

> Notwithstanding the provisions of any of these procedural or technical rules, the presiding judge, upon application of the media coordinator, may permit the use of equipment or techniques at variance therewith, provided the application for

variance is included in the advance notice of coverage provided for in Rule 3"b." Objections, if any, shall be made as provided by Rule 3"c." Ruling upon such a variance application shall be in the sole discretion of the presiding judge. Such variances may be allowed by the presiding judge without advance application or notice if all counsel and parties consent to it.

Subparagraph (i) authorizes the court to alter the expanded coverage to fit a changing situation as a trial progresses. It states:

> The judge may, as to any or all media participants, limit or terminate photographic or electronic media coverage at any time during the proceedings in the event the judge finds (1) that rules established under this Canon, or additional rules imposed by the presiding judge, have been violated, or (2) that substantial rights of individual participants or rights to a fair trial will be prejudiced by such manner of coverage if it is allowed to continue.

Douglas's trial counsel, Angela Simon and David Hammer, vehemently objected to the presence of live microphones at the counsel table. At the hearing on the media's application, counsel Simon stated:

> We have tested the microphones ourselves this morning and discovered that they are so sensitive that even at the far reaches of the counsel table they can pick up a whisper. We consider this an unwarranted and unlawful intrusion into the attorney-client relationship. We're unable to carry on a full and frank discussion with our client. Matters that might come up in the course of the trial we're not free to discuss.

Defense counsel noted that the microphones were equipped with cut-off switches but complained that it placed an unfair burden on counsel to perform trial duties and to have to remember to operate microphones simultaneously. In fact, to deactivate a microphone it was necessary to continuously hold the cut-off down. A response was given by media personnel that confidential discussions between counsel and the defendant detected by the microphones would not be publicized. Unassuaged by this, defense counsel said, "They have no right to hear anything from counsel table in the first place." Counsel Hammer was twice told that the media people would act responsibly and would not publish in any manner any confidential communication and he should have no concern. The district court overruled the objections and permitted the microphones.

After the second day of trial, defense counsel Simon heard a television news broadcast by KCRG at night discussing developments in the Douglas trial. On the screen she observed the image of herself conferring with co-counsel. She believed she heard co-counsel Hammer's voice during the broadcast. Knowing that co-counsel had not participated in the questioning that day, she concluded that a confidential communication had been broadcast.

Defense counsel complained to the trial court and sought verification. A copy of the news broadcast was requested from KCRG by counsel Hammer's office, which was informed that the tape of the broadcast would have to be subpoenaed. The trial judge orally notified Grant Price, the overall media coordinator, of the concern about this broadcast. Price indicated that since objection had been made at the inception of the trial, the court could expect no cooperation from the local media coordinator in charge, and request for a copy would have to be made to KCRG itself. Dean Bunting of KCRG was named as the person to contact. When that was attempted, the judge was informed that Bunting was busy in other matters and could not talk to the judge. The next day, November 2, 1990, when the judge called again, he was told that KCRG would cooperate but would like the request "backed up with a subpoena."

The court issued a subpoena directing that a tape of the news broadcast by KCRG at 10:00 p.m., October 31, 1990, be in the court's possession by November 7 for an *in camera* inspection. On November 9, a tape was delivered to the court by Emery Worldwide Service. It was not of

the broadcast; it was some taping by KCRG of the crime scene on June 22, 1990. Upon inquiry, the court was informed that KCRG did not keep tapes of their news broadcasts more than seven days. The court noted that it orally requested the tape the day after the broadcast in order to alert KCRG to what was wanted before too much time had passed. KCRG also claimed that it did not have a tape of the broadcast, that such things are kept by national news networks but not by local news networks. The facts recited above were made of record by the trial judge and defense counsel at a postjudgment hearing.

We have said that to establish prejudice a defendant can request a posttrial evidentiary hearing "to show adverse impact or injury." *State v. Webb*, 309 N.W.2d 404, 408 (Iowa 1981). In the *Webb* case, we also adopted the prejudice standard enunciated in *Chandler v. Florida*, 449 U.S. 560, 582–83, 101 S.Ct. 802, 813–14, 66 L.Ed.2d 740, 757 (1981), for resolving challenges to expanded media coverage premised on the Iowa Constitution. The *Chandler* case held that the constitution does not prohibit a state from experimenting with a program for expanded media coverage absent a showing of prejudice of constitutional dimensions. The Supreme Court said that a defendant might show that broadcast coverage of his particular case had an adverse impact on the trial participants sufficient to constitute a denial of due process. In *Webb*, we found that no evidentiary hearing had been requested and no adverse effect was shown. Applying the standard in *State v. Johnson*, 318 N.W.2d 417, 424–26 (Iowa 1982), we again held that expanded coverage did not result in depriving defendant of his constitutional right to a fair trial. Defendant's reliance to prove prejudice due to harassing phone calls, exposure of the trial judge to a media display during trial, and defendant's decision not to testify because of expanded coverage failed to meet the high standard required.

■ In the instant case, the complaint made initially and at the posttrial evidentiary hearing was that the presence of live microphones at counsel table intruded on defendant's right to private communication with his counsel and on their availability to concentrate on trial matters without media interference. Although clearly a nuisance, the microphone's presence do not appear in this case to have prevented or even impeded Douglas's counsel in the presentation of his defense. Not a single instance is cited where the defendant's claims or evidentiary proof were adversely affected from this cause. A reviewing court cannot predicate error on speculation. *See State v. Ritchison*, 223 N.W.2d 207, 212–13 (Iowa 1974). We find that prejudice to Douglas's constitutional rights as claimed herein because of expanded media coverage has not been established.

Nevertheless, we view with alarm the disdainful attitude displayed by the media in this case. The impression given is that once expanded media coverage was granted, media conduct was above reproach and beyond review. Despite assurances of responsibility, the media representative's promise to not broadcast confidential communications was apparently violated. Efforts to verify this were met with the media's reaction of outright rejection, delay, delivery of a substituted tape, and destruction of evidence. Claims of a willingness to cooperate with the court in providing a tape of the broadcast had the hollow sound of pretense when combined with the media's prerequisite of a subpoena. The professional standards professed by the media were badly undermined by this episode.

■ It is clear that the presence of live microphones at the counsel table creates a real potential for prejudicing a defendant's constitutional rights. Further complicating this issue is the fact that proving a negative, *i.e.*, that counsel was prevented from adequately representing the defendant, is difficult. Having in mind that the irreducible charge of the trial court is to assure a fair trial, careful consideration to these constituents must be given in deciding if expanded coverage is warranted. Viewed in retrospect, the trial court would have been well advised in denying the media's request for the type of live microphones at the counsel table used in this case.

Our rules allowing expanded media coverage have been drafted to give the public increased access to judicial proceedings. This access is, nevertheless, subject to the duty and authority of the presiding judge to control the conduct of proceedings, to prevent distractions, and to ensure the fair administration of justice. *See* Iowa Code of Judicial Conduct, Canon 3A(7). Subsection seven specifically includes electronic media as being allowed in public judicial proceedings but makes them subject to the trial judge's supervision. With that in mind, we encourage trial judges to assiduously exercise their authority over the judicial proceedings in order to assure a fair trial to the parties.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.