# IN THE COURT OF APPEALS OF IOWA

No. 14-0971
Filed May 6, 2015

**JONATHAN QUINCY ADAMS,**
        Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
        Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Robert J. Blink, Judge.

Jonathan Adams appeals from the district court's denial of his application for postconviction relief.   **REVERSED AND REMANDED.**

Alfredo Parrish of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann LLP, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Jean C. Pettinger, Assistant Attorney General, John P. Sarcone, County Attorney, and James Ward, Assistant County Attorney, for appellee State.

Considered by Danilson, C.J., Potterfield, J., and Miller, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**DANILSON, C.J.**

Jonathan Adams appeals from the district court's denial of his application for postconviction relief (PCR). He maintains the district court wrongly denied his application because he established he received ineffective assistance from trial counsel. Specifically, he maintains trial counsel was ineffective for failing to challenge the lack of proximate cause between intoxicated driving and the victim's death and for failing to request a jury instruction regarding proximate cause. Because we find counsel was ineffective for failing to challenge the lack of proximate cause and seek an instruction on proximate cause and there is a reasonable probability the result of the proceeding would be different, Adams has established his claim of ineffective assistance. We reverse the decision of the district court and grant a new trial.

**I. Background Facts and Proceedings.**

We adopt our recitation of facts from Adams' direct appeal:

> At approximately 10:45 p.m. on Friday, December 8, 2006, a vehicle operated by Jonathan Adams struck a bicycle ridden by Tina Marie Brown in the westbound lane of Park Avenue in Des Moines. Brown died as a result of the injuries she received in the accident.
> On the day of the accident, Jodi Woods, a friend of Jonathan Adams, hosted a party at her house in Des Moines. The party started at approximately 8:30 a.m. The party had chips and snack trays for everyone, but guests were to bring their own beverages. People came and went throughout the day, and it was estimated that somewhere between fifteen and thirty people attended the party.
> . . . .
> At approximately 5:00 p.m., Sean Erickson, a friend who lived in the same apartment complex as Adams, came to Adams's apartment to get a ride to Woods's party. Adams and Erickson soon left for the party, but they decided to pick up some beer en route at a local gas station. Adams purchased a twelve-pack of Budweiser cans, while Erickson purchased a twenty-pack of

Budweiser bottles. These transactions were recorded on the store's surveillance video, which was shown to the jury.

Upon arriving at the party between 5:30 and 5:45 p.m., Adams placed his beer into the refrigerator and spent several hours talking to guests in the kitchen. During trial nine witnesses were called to testify as to their interaction with Adams while at the party, mainly on the subject of whether Adams appeared intoxicated.

Jodi Woods, the host, admitted she was intoxicated. She testified that she did not even remember Adams and Erickson showing up at the party.

Erickson testified that he got "pretty drunk" at the party and that he was still "intoxicated" when he and Adams left the party later that evening. Although Erickson denied to some extent that Adams was intoxicated, he also confirmed his prior deposition testimony that "[he] wouldn't say [Adams] was sober" while at the party. Erickson also acknowledged having told his cousin after the accident that both he (Erickson) and Adams were intoxicated. Erickson testified that he could have consumed some of Adams's beer, and vice versa.

Andrew Mattes, a guest, testified that Adams "came off as a little bit arrogant" and "obnoxious" at the party. He also stated that Adams had a beer in his hand at the party, but he did not know if he was drunk.

Jennifer Mattes, Andrew's wife, also spent time in the kitchen talking to Adams. She testified that Adams was "loud and obnoxious" and that "the entire time [she] saw him he had a can of beer or a bottle of beer in his hand." However, she did not see enough of Adams to form a judgment whether he was intoxicated, although she did not believe that Adams was intoxicated.

Matthew Montgomery, another guest, spent a majority of his time at the party in the garage and living room, where the kitchen is not visible. However, Montgomery did interact with Adams on one occasion when Adams made fun of Montgomery's Philadelphia Eagles sport jacket. Adams is a Pittsburgh Steelers fan. Montgomery testified that he thought Adams was "a little unsteady on his feet. His speech seemed to be a little bit slurred." Montgomery also noted that Adams rocked back and forth and was wobbly, that Adams "was kind of aggressive, and he was kind of belittling some people." Montgomery further testified that he thought Adams was too intoxicated to drive home. Montgomery did admit he had used marijuana twice that evening.

Chad Adams, Jonathan Adams's brother, testified that his brother was drinking but did not appear intoxicated. Also, Chad Adams's wife, Michelle Mullica, testified she spoke with Jonathan Adams while at the party and did not believe he was intoxicated. Jose Padilla testified that Jonathan Adams did not appear intoxicated although he had a beer in his hand.

Christopher Dow, a school teacher and a friend of Adams, testified that he arrived at the party at 10:00 p.m., shortly before Adams left. At the time of his arrival, Dow believed that Adams was not intoxicated.

Adams, who took the stand in his own defense, claimed that he "opened" three or four cans of beer and "sipped" them during the evening. He testified that others consumed some of the beer he had brought. Adams also admitted that he opened a bottle of Budweiser. He denied that he was under the influence of alcohol when he left the party.

At around 10:45 p.m., Adams and Erickson decided to go home in Adams's car. It is undisputed that the right front headlight on Adams's car, a Chevrolet Monte Carlo, was not operating. Adams drove while Erickson sat in the passenger seat. When they left, Adams and Erickson had four cans (out of an original twelve) and two bottles (out of an original twenty) of beer remaining. These were placed in the backseat of the car. Adams testified that as he was proceeding west on Park Avenue, he took his eyes off the road to change the satellite radio station in his car. At that time, his vehicle struck Brown who was riding her bicycle in the same westbound direction near the curb. Brown was thrust onto the hood of the vehicle and her head slammed into the windshield collapsing it inward. Brown's body then rolled to the right, broke the passenger side mirror and came to rest 86.4 feet from the initial collision point. As a result of this collision, Brown suffered skull fractures that caused her death.

Erickson and Adams each told a different story about what happened after the collision. Erickson testified that he did not know what the car had hit, but when they were stopped at a red light a block after the collision, he turned and asked Adams what had happened. Adams then responded, "Shut the f——up and let me think for a minute." After that, Adams proceeded to drive to the apartment complex.

Adams disputed Erickson's version. He testified that after the collision he immediately turned to Erickson and asked him what they had hit. According to Adams, Erickson answered that he thought they had hit a trash can. Adams went on to testify that as they approached the red light at the intersection it turned green so he proceeded through it, still confused and trying to figure out what had just happened. Adams also stated that when they parked at the apartment complex, Erickson finally stated that maybe they had hit a bike, to which Adams responded that it could not have been a bike at this time of night in December.

After arriving at the apartment complex, Adams and Erickson retired to their respective apartments. Adams called his brother Chad to talk about what had just happened. According to their testimony, Chad attempted to calm Adams by reassuring him that

he could not have struck a bicycle; it must have been just a trash can.

At no point during that night did Adams or Erickson contact the police. Rather, around 11:00 p.m., another motorist discovered Brown's body in the road. He made an emergency 911 call, and Brown was pronounced dead at the scene. The Des Moines police immediately began an investigation. During Saturday, December 9, the police canvassed local parking lots and advised local media outlets that they were looking for a red-colored vehicle with extensive front end damage.

The following morning, Sunday, December 10, Chad saw the news reports of the incident and called Adams. Later that afternoon, Adams had his mother take him to Wal–Mart where he purchased a car tarp to cover his vehicle.

Police continued to investigate the accident, but neither Adams nor Erickson contacted the police. Eventually, on Sunday night, Erickson telephoned a cousin in Texas and told him that both he and Adams had been intoxicated and that they had hit and killed a woman. The cousin contacted the police, who immediately went to the apartment complex to talk to Adams and Erickson. Neither were home at the time, but the police did discover the car under the tarp.

On Monday, December 11, 2006, Adams contacted an attorney and turned himself in. Adams was eventually charged by trial information with homicide by vehicle, OWI, and leaving the scene of an accident. A jury trial was held from December 12 through December 18, 2007, and Adams was found guilty on all charges. Motions for arrest of judgment and new trial were denied, and the court sentenced Adams to twenty-five years imprisonment for homicide by vehicle, one year for OWI, and two years for leaving the scene of an accident, all sentences to run concurrently. Adams is required to serve at least seven-tenths of his twenty-five year sentence.

State v. Adams, No. 08-0513, 2009 WL 3337603, at *1–3 (Iowa Ct. App. Oct. 7, 2009).

On direct appeal, Adams maintained trial counsel was ineffective "for failing to request a jury instruction on causation and properly raise the State's proof of causation." State v. Adams, 810 N.W.2d 365, 372 (Iowa 2012). Our supreme court held the State has the burden to prove a causal connection between the defendant's intoxicated driving and the victim's death. Id. at 371.

Because trial counsel had "not been permitted an opportunity to explain whether a causation defense was considered" or "whether there were plausible strategic reasons for not pursuing it," the supreme court affirmed Adams' conviction and preserved his claim of ineffective assistance for possible PCR proceedings. *Id.* at 373–74.

Adams again raised the claims of ineffective assistance in his application for PCR. The district court held a hearing on the matter on March 27, 2014. At the hearing, trial counsel testified he "did not believe that [the proximate cause instruction] was required" prior to the supreme court's holding in Adams' direct appeal. Trial counsel also testified he did not consider defending the case for lack of proximate cause but stated he was aware that the State had the burden to prove the causation element before the trial. Counsel believed the jury instruction that was used properly summarized the law.

On June 9, 2014, the district court denied Adams' application for PCR. Adams appeals.

**II. Standard of Review.**

We typically review postconviction-relief proceedings on error. *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001). However, when the applicant asserts claims of a constitutional nature, our review is de novo. *Id.* Thus, here we review the applicant's claim of ineffective assistance de novo. *See id.*

**III. Discussion.**

Adams maintains he received ineffective assistance because trial counsel failed to challenge the lack of proximate cause between intoxicated driving and

the victim's death and failed to request a jury instruction regarding proximate cause.

To prevail on a claim of ineffective assistance of counsel, Adams must prove by a preponderance of the evidence (1) the attorney failed to perform an essential duty and (2) prejudice resulted from the failure. *State v. Rodriguez*, 804 N.W.2d 844, 848 (Iowa 2011). To prove counsel failed to perform an essential duty, he must show "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *See Strickland v. Washington*, 466 U.S. 668, 688 (1984). Adams must overcome a strong presumption of counsel's competence. *See id.* at 689. To establish prejudice, he must show there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See id.* at 694. "The likelihood of a different result must be substantial, not just conceivable." *State v. Ambrose*, ___ N.W.2d ___, 2015 WL 47853, at *5 (Iowa 2015). We "will not reverse where counsel has made a reasonable decision concerning trial tactics and strategy, even if such judgments ultimately fail." *Brewer v. State,* 444 N.W.2d 77, 83 (Iowa 1989). The claim fails if either element is lacking. *See Everett v. State*, 789 N.W.2d 151, 159 (Iowa 2010).

**A. Duty.**

Prior to Adams' trial, case law established that in order to sustain a conviction for manslaughter by drunken driving, it is necessary to show a direct causal connection between the defendant's drunken driving and a decedent's death. *See State v. Rullestad*, 143 N.W.2d 278, 280 (Iowa 1966); *see also State v. Wullner*, 401 N.W.2d 214, 219 (Iowa Ct. App. 1986) ("In order to sustain an

8

involuntary manslaughter conviction based upon the public offense of drunk driving, it is necessary to show a direct causal connection between the drunk driving and the death."). Additionally, in *State v. Wieskamp*, 490 N.W.2d 566, 567 (Iowa Ct. App. 1992), our court concluded proof of the causal connection is required for a conviction under section 707.6A(1)(a)—the statute Adams was convicted under. We stated, "The evidence is undisputed in this case that a sober driver with reasonable care would have struck the victim . . . . Therefore [the defendant's] intoxicated driving was not a substantial factor in causing the victim's death. We dismiss the vehicular homicide charge . . . ." *Wieskamp*. 490 N.W.2d at 567.

Here, Adams' trial counsel failed to challenge the lack of proximate causal connection between the criminal act of intoxicated driving and the victim's death or request a jury instruction on proximate cause. The supreme court preserved Adams' claim of ineffective assistance on direct appeal because "[t]rial counsel ha[d] not been permitted an opportunity to explain whether a causation defense was considered and if it was considered, whether there was plausible strategic reasons for not pursuing it." *Adams*, 810 N.W.2d at 373–74.

At the PCR hearing, trial counsel admitted he never considered challenging the lack of proximate cause. Counsel maintained, in hindsight, that defending the case two ways—both that Adams was not intoxicated at the time and challenging the lack of proximate cause—would have overall weakened Adams' defense. Although counsel attempted to portray the failure to challenge the lack of proximate cause as a strategic decision, we do not believe the failure to consider a possible defense can be characterized as strategy.

Additionally, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 690. Here, counsel's attempt to explain why pursuing both defenses may not have been effective amounts to nothing more than Monday morning quarterbacking.

Trial counsel's failure to challenge the lack of proximate cause and request a jury instruction on proximate cause constituted failure to perform an essential duty.

**B. Prejudice.**

The record tends to prove that, at the time of the crash, the victim was wearing dark clothing while bicycling on a high-traveled city street, late at night in December. Moreover, the right headlight of Adams' car was not functioning at the time.[1] Our supreme court stated, "Under these circumstances, we think a rational fact finder could have found Adams' alleged intoxicated driving was not the factual cause of Brown's death because a driver who had not ingested alcohol before the crash would have struck the victim . . . ." *Adams*, 810 N.W.2d at 373 n.9. We agree.

**IV. Conclusion.**

Because we find counsel was ineffective for failing to challenge the lack of proximate cause and seek an instruction on the same, and there is a reasonable probability the result of the proceeding would have been different, Adams has

---

[1] The lack of a headlight may reflect negligence but alone does not support criminal responsibility for involuntary manslaughter.

established his claim of ineffective assistance. We reverse the decision of the district court and a grant a new trial.

**REVERSED AND REMANDED.**