# IN THE COURT OF APPEALS OF IOWA

No. 15-0038
Filed June 15, 2016

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ALICIA RITENOUR,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Mahaska County, Myron L. Gookin, Judge.

        A defendant appeals her conviction for murder in the first degree in the death of her eighteen-month-old daughter.  **AFFIRMED.**

        Mark C. Smith, State Appellate Defender, and Vidhya K. Reddy, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Kyle P. Hanson, Assistant Attorney General, for appellee.

        Heard by Danilson, C.J., Vaitheswaran, Potterfield, Tabor, and McDonald, JJ.

**TABOR, Judge.**

Eighteen-month-old Ava suffered severe skull fractures and died of head injuries in her bedroom. A jury convicted her mother, Alicia Ritenour, of murder in the first degree. On appeal, Ritenour claims the district court improperly excluded evidence that another adult living in the apartment was withdrawing from methamphetamine use at the time of the killing. She also claims her trial counsel was ineffective in failing to object to testimony opining on her credibility and to statements by the prosecutor in closing argument suggesting she had lied to authorities.

Because Ritenour offered no expert testimony concerning the implications of methamphetamine withdrawal and the witness denied it impacted his perceptions or memory, we cannot find the court abused its discretion by excluding the evidence. We affirm Ritenour's conviction and preserve her claims of ineffective assistance of counsel for possible postconviction proceedings.

**I.    Facts and Prior Proceedings**

In January 2014, Ritenour was living with her daughter and her boyfriend, Jacob Rauch,[1] in a two bedroom apartment in Oskaloosa. Also living in the apartment was Rauch's best friend, Logan Cavan, and Ritenour's fifteen-year-old friend, A.P., who would stay with them while her father was out of town on business. Ritenour and Rauch shared one bedroom, Ava had her own bedroom, A.P. slept on the living room couch, and Cavan slept on the living room floor.

Neither Rauch nor Cavan paid any rent. Rauch did chores around the apartment and helped care for Ava. Cavan did not willingly participate in chores

---

[1] Rauch is not the child's father.

or child care. In fact, Cavan discouraged Rauch from assisting with child care, saying, "Don't do that, make [Ritenour] do it . . . . It's her kid." Testimony indicated Cavan begrudged the time Rauch spent with Ritenour and Ava. Cavan spent a significant percentage of his day sleeping in the apartment and was often angry when awoken. Cavan also expressed frustration when Ava cried. On one occasion, the neighbors were babysitting Ava when Cavan tried to engage in conversation over her fussing. He grew angry, clenched his fist, and cocked it back over his shoulder like he was going to punch the child, saying, "Shut the fuck up." He then commented that all Ava ever did was cry and sometimes he wanted to "knock her out." Cavan testified he was only joking during this incident.

Ritenour's level of satisfaction with her life as a mother was the subject of debate at trial. Testimony indicated Ritenour was an attentive mother when Rauch and Cavan moved into the apartment in November 2013. But over the next few months, she paid more attention to her relationship with Rauch and less to parenting Ava. Both Rauch and Cavan testified Ava was left alone in her room with the door closed for long stretches without anyone checking on her. Rauch said Ava was usually watching a continuous loop of the cartoon *Team Umizoomi*, playing with toys, or listening to the radio. Rauch and Cavan also testified Ritenour would place the child's bottle inside the door or toss it on the bed, then shut the door, leaving the child to feed herself. The State offered evidence from

Ritenour's Facebook "wall," posted on January 20, 2014, a few days before Ava died, indicating Ritenour believed her life was "like one big ball of shit."[2]

In her testimony, Ritenour contradicted the narrative of poor parenting and denied dissatisfaction with her situation. Ritenour testified she would leave the door closed so Ava would nap but would check on her if she cried. Ritenour defended the practice of tossing the bottle on the bed, contending it was a game Ava liked to play since graduating from her crib to a toddler bed. Ritenour also insisted she was successfully balancing her romance with motherhood: "My life was great. I had my daughter and everything was going okay for me, and I just wanted to try to have a relationship."

On the night of January 23, 2014, Ritenour and Rauch had friends over to the apartment. Cavan and A.P. were also home. Ritenour, Rauch, and their friends smoked marijuana and watched a movie. No one checked on Ava, who was in her room during the gathering. After the guests left, Ritenour, Rauch, Cavan, and A.P. continued to watch movies in the bedroom. Eventually, Cavan moved to the living room couch to sleep. When A.P. went to bed, she woke Cavan so she could sleep on the couch. Cavan returned to the bedroom to watch the movie for a short time before falling asleep. Rauch woke Cavan and bribed him to leave the room by offering him a cigarette, which Cavan threw in Rauch's face. Rauch, Ritenour, and A.P. all testified, at this point, Cavan kicked or hit the wall, but Cavan denied doing so.

---

[2] Ritenour apparently was paraphrasing these rap lyrics: "Every time I go to get up I just fall in piss, My life's like one great big ball of shit." Eminem, *Run Rabbit Run*, *on* Music from and Inspired by the Motion Picture 8 Mile (Shady Records 2002).

The noise woke Ava who started crying, according to Rauch's testimony. Ritenour attended to her daughter while Rauch continued to watch the movie. According to Rauch, Ritenour was with Ava for about thirty minutes before Rauch heard Ritenour "throwing Ava's toys into her toy box and screaming a bit." Rauch testified he went and sat with Ava and gave her a bottle while Ritenour took a shower. According to his testimony, Ava was falling asleep so he put her to bed and left the room around 11:00 p.m. Ritenour testified she did not remember Rauch coming in to help her or remember leaving to take a shower.

On the morning of January 24, Ritenour left the apartment to take A.P. to school. A.P. testified she saw Ritenour prepare a bottle for Ava and place it inside the door of the child's room before they left. A.P. also told police she thought she heard the child moving around in the room. Cavan testified he woke up when he heard them shut the apartment door. He explained he poured himself a bowl of cereal, moved to the couch, and fell back asleep while eating. Ritenour testified when she returned from taking A.P. to school, she noticed Cavan was covered with a different blanket than the blanket covering him when she left. She then went to her own bedroom and had sex with Rauch before falling back asleep. No one testified to checking on Ava that morning.

At 2:00 p.m., Ritenour's mother, Tina, arrived at the apartment. Tina entered Ava's room and found the child unresponsive, covered with a blanket,[3] and lying on her stomach on the floor. Rauch and Cavan woke to the screams of Ritenour and Tina. Rauch remembered Tina saying, "What did you do, Alicia"?

---

[3] Ritenour testified this was the blanket Cavan was using when she left to take A.P. to school.

Rauch heard Ritenour respond, "I didn't do anything, Mom. I didn't do anything." Cavan recalled a slightly more incriminating response from Ritenour: "I'm sorry. I didn't mean to. I didn't do it."

At Tina's urging, Rauch called 911 as Tina tried to revive the child. Lieutenant VanRenterghem responded first and assisted in CPR. A few minutes later the paramedics arrived on the scene and ended the resuscitation efforts after observing obvious signs of death. Ritenour told the paramedic, Joshua Crouse, Ava had not been feeling well for several days and was sick the night before. Ritenour also told him Ava had fallen and hit her head on a "pig-shaped" toy. Ritenour had missed a doctor's appointment for the child—citing car trouble—but told authorities it was the doctor's office that cancelled the appointment.

An autopsy conducted the following day revealed fractures to the back of the child's head so numerous that her skull resembled a map of the east coast of the United States. Dr. Michele Catellier, an associate state medical examiner, opined Ava was subjected to four or five distinct blows. A pig-shaped toy found in the child's bedroom was consistent with the pattern of the fractures, but Dr. Catellier was not certain if the toy was the instrument causing Ava's injuries. The doctor placed time of death at between six and twelve hours before the body was found. Dr. Catellier testified symptoms such as loss of consciousness, seizures or other abnormal movements, vomiting, eye rolling, and the sudden stoppage of breathing would have occurred almost immediately.

Law enforcement officers interviewed Ritenour on four occasions: January 24, 25, 31, and October 27, 2014. Her version of the events was

inconsistent over time. She initially told officers Ava woke up on the morning of January 24, ate breakfast, and took a nap around 11 a.m. In a follow-up interview the next day, Ritenour told the police she made the bottle in the morning but did not check on Ava until the body was discovered. Ritenour did not mention Cavan's blanket being a different blanket until she was interviewed on January 31, 2014.

On February 13, 2014, the State charged Ritenour with first-degree murder in violation of Iowa Code sections 707.1 and 707.2(5) (2013), and child endangerment resulting in death, in violation of section 726.6(1)(a), and (4). Thereafter, in her October 27 interview, Ritenour told law enforcement she heard a loud thump while showering when the child was in Rauch's care. But she did not check on the child when she was done showering. This version of the events had changed by the time of her jury trial, commencing on November 12, 2014. At trial, she denied Rauch helped put the child to bed at all during the evening in question.

The jury found Ritenour guilty on both counts. The court merged the two convictions and sentenced Ritenour to life in prison without parole. Ritenour now appeals.

## II. Scope and Standards of Review

We review evidentiary rulings on relevance for an abuse of discretion. *State v. Elliott*, 806 N.W.2d 660, 667 (Iowa 2011). We review claims of ineffective assistance of counsel de novo. *State v. Ondayog*, 722 N.W.2d 778, 783 (Iowa 2006).

## III.    Analysis

### A.    Admissibility of Cavan's Methamphetamine "Crash"

Before trial, the State filed a motion in limine to exclude any evidence of witnesses' drug use outside the time period of Ava's death.   Cavan testified during his deposition that on January 23 he was sleeping for extended periods of time because he was "crashing" from a methamphetamine high he had experienced several days earlier.   Ritenour argued Cavan's withdrawal was relevant to his behavior, perception, and memory at the time of the child's death.

The district court ruled:

> [Any] drug usage by a witness as it relates to their conduct, perception and memory of events related to the death of the victim is relevant to a legitimate issue, namely, the ability of the witness to accurately and truthfully testify to such events, and the probative value of such evidence is not substantially outweighed by unfair prejudice . . . however, that drug use that cannot be connected to conduct, perception, and memory of events related to the death of the victim would be considered inadmissible prior-acts evidence.

At trial, the defense made a brief offer of proof outside the presence of the jury in which Cavan testified he had not used methamphetamine during the "week and a half" before the night in question.   He also diverged from his deposition testimony, pointing to reasons other than drug withdrawal to account for why he was sleeping so much.   He cited his depression and the fact he had "nothing to do."   The defense argued Cavan's varying stories were admissible to challenge his veracity as a witness.   The defense also argued his statements about "crashing" were admissible because they went to his ability to perceive and recollect.

The State resisted, pointing out the defense did not plan to offer any expert testimony illuminating the time frame in which methamphetamine use or withdrawal would affect a person's perceptions. The State also argued the defense was trying to "bootstrap this into a methamphetamine case."

The district court then engaged in the following exchange with Cavan:

> THE COURT: Mr. Cavan, in the days leading up to the incident, the death of the child, you've indicated that you were crashing or coming down. Did that affect your ability to understand or remember things or perceive things that were going on at the time?
> CAVAN: No, sir.
> THE COURT: Did it affect your memory of events that occurred during that time?
> CAVAN: No, sir.
> THE COURT: Based on the record made, it does not appear to me that there is any effect by this crashing or coming down, as Mr. Cavan has described it, to his conduct, perception, or memory of events related to the death of the victim, which otherwise would be relevant if it did affect those things.

On appeal, Ritenour argues the district court abused its discretion because Logan's "methamphetamine crash" on the day before the child's death was relevant to "legitimate non-character purposes" under Iowa Rules of Evidence 5.401, 5.402, and 5.404(b). First, she argues the withdrawal evidence was relevant to show Cavan would have been less likely to observe and accurately remember events. Second, she contends the evidence was "highly relevant to his state of mind and motive to inflict devastating injuries on the child."

**Error Preservation.** The State argues Ritenour did not preserve her second appellate claim regarding the relevance of the methamphetamine withdrawal to Cavan's motive or intent because trial counsel only argued the withdrawal affected Cavan's ability to perceive and recollect. It is true that the

defense offer of proof and the court's questions to Cavan addressed only his perception and memory. The State did not have an opportunity to respond at trial to the question of whether Cavan's withdrawal from methamphetamine could have contributed to an intent or motive to kill Ava. We therefore find Ritenour failed to preserve error on the relevance of methamphetamine withdrawal as it relates to Cavan's motive or state of mind.

As an alternative argument, Ritenour asks us to find her counsel ineffective for failing to secure a ruling on Cavan's methamphetamine use as it related to his motive and intent. Because the record is inadequate to assess the attorney's performance on this question, we preserve this ineffective-assistance-of-counsel claim for possible postconviction proceedings. *See State v. Reynolds*, 670 N.W.2d 405, 411 (Iowa 2003) ("Generally, ineffective-assistance claims are preserved for postconviction-relief proceedings to afford the defendant an evidentiary hearing and thereby permit the development of a more complete record.").

**Relevance.** Ritenour argues Cavan's prior drug use and the resulting "crash" was relevant to show he was less likely to accurately observe or recall what happened in the apartment during the hours leading up to Tina finding Ava unresponsive. Evidence meets the relatively low bar of relevance if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* Iowa R. Evid. 5.401. The district court did not find Cavan's withdrawal from methamphetamine made it more probable that his

perceptions or memory would have been impaired. On the record made at trial, we cannot find the district court's decision constituted an abuse of discretion.

The defense presented only Cavan's testimony during its offer of proof. Cavan denied that coming down from a methamphetamine high impacted his perception or memory at the time of the murder. The defense did not explore with Cavan how much or how often he used methamphetamine, or how withdrawal normally had affected him. The record did not show whether Cavan was a chronic abuser or a one-time user. As the State points out, the defense did not offer expert testimony on the physiological effects of taking or withdrawing from methamphetamine.

Ritenour argues lay people have some understanding of the impact of drug use, citing *People v. Williams*, 751 P.2d 395, 415-16 (Cal. 1988) (noting "drug intoxication or withdrawal" are "subjects with which the average man has some knowledge" and "unfortunately may be sufficiently common today that lay persons are capable of recognizing them"). The State counters that most jurors lack knowledge or experience with the effects of methamphetamine or appreciate how long such drugs would influence a person's physiology.

We agree that absent expert testimony, or even additional lay testimony concerning the extent of Cavan's methamphetamine use, the defense did not show the relevance of his withdrawal from the drug. This case is not like *State v. Petithory*, 702 N.W.2d 854, 859 (Iowa 2005), where the court heard expert testimony concerning the "staggering" after-effects of methamphetamine use on addicts placed in positions of caring for children. Here, the jurors would have

had to fend for themselves in deciding how methamphetamine withdrawal would impact the witness's ability to perceive or remember events.

Given the minimal information provided in the offer of proof, we conclude the district court did not abuse its discretion in determining Cavan's prior drug use and subsequent withdrawal were not relevant areas of inquiry. *See State v. Baccam*, 476 N.W.2d 884, 888 (Iowa Ct. App. 1991) (finding no abuse of discretion in court's ruling limiting evidence of witness's drug use to the time of the incident).

## B. Ineffective Assistance of Counsel

Ritenour claims her trial counsel was ineffective for failing to challenge testimony by police officers and the medical examiner that could be construed as opinions on her credibility and the credibility of other witnesses. She also contends her attorney should have objected during closing arguments when the prosecutor made statements suggesting she told lies to avoid responsibility in her child's death.

To succeed on her claims of ineffective assistance of counsel, Ritenour must prove trial counsel's performance fell below what is expected of a reasonably competent defense attorney and those performance deficiencies resulted in prejudice to her case. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The attorney's performance is measured against "prevailing professional norms," and it is presumed the attorney performed competently. *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001).

**Expert Testimony on Credibility.** Ritenour complains that prosecution witnesses were allowed to testify, without objection, that her demeanor and her

varied versions of events raised "red flags" about her credibility, while the behavior of Rauch and Cavan did not arouse any suspicions. She highlights case law prohibiting expert witnesses from rendering an opinion "either directly or indirectly" on the truthfulness of a witness. *See State v. Dudley*, 856 N.W.2d 668, 675-76 (Iowa 2014); *State v. Brotherton*, 384 N.W.2d 375, 378 (Iowa 1986). Ritenour contends that prohibition was breached by objectionable statements from three law-enforcement witnesses and the medical examiner.

Ritenour first points to testimony from Lieutenant VanRenterghem that when he saw her still crouched over the child in the bedroom, "as a police officer, as a father, I just thought her demeanor was very strange." He recalled: "At times she was not upset at all and would turn around and become a little emotionally upset and turned right around again and checking a text or sending a text. I thought that very odd for somebody that just learned their child had passed away." In contrast, Lieutenant VanRenterghem did not find the reactions of Rauch and Cavan to be out of the ordinary. The officer recalled Rauch was "frantic" and Cavan was sitting "kind of like a lump, just had no demeanor to him."

Ritenour next focuses on Lieutenant Troy Boston, who testified the behavior of Rauch and Cavan did not raise any "red flags" for him, but Ritenour's behavior did. Boston stated, "[I]n my experience dealing with people who have had a death in their family, especially a small child, they do everything they can to help you. They don't come in and tell different stories."

In addition, Ritenour expresses concern about testimony from Iowa Division of Criminal Investigation special agent Don Schnitker. In discussing why he became more verbally aggressive with Ritenour during an interview, the agent

testified: "If I don't believe your story, I start asking you why the story changes, and that sometimes gets confrontational." Ritenour also faults her attorney for not objecting when Boston and Schnitker provided commentary on the "degree" of the inconsistency between her various statements to law enforcement.

Ritenour also raises an issue regarding a comment by Dr. Catellier, who testified, in general, she considers inconsistent stories to be a "red flag" in determining if an injury to a child is nonaccidental.

Ritenour argues all four witnesses, either directly or indirectly, opined on her credibility and the ultimate issue of her guilt. She contends while each of the highlighted statements standing alone may not be problematic, taken as a whole, the unobjected-to opinions posed "a substantial risk the jurors would have relied upon and deferred to the above witnesses' express or implied assessments of credibility and determinations of guilt/innocence."

The State responds that counsel had no cause to object because the witnesses were not commenting on Ritenour's credibility but rather describing their observations of her behavior. The State further contends Ritenour cannot show prejudice because the challenged testimony was cumulative to the evidence Ritenour changed her story over the course of the investigation.

Because Ritenour raises these claims on direct appeal, we must decide if the record is adequate to resolve them now or if it would be more prudent to preserve her claims for a postconviction-relief action. Our preference is to reserve such questions for further proceedings so trial counsel can defend against the allegations. *State v. McNeal*, 867 N.W.2d 91, 105-06 (Iowa 2015). We find reservation of the questions "especially appropriate" when the

challenged performance involves a trial strategy that counsel could explain if the record were fully developed. *See State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012). "It is a rare case in which the trial record alone is sufficient to resolve a claim on direct appeal." *McNeal*, 867 N.W.2d at 106.

In deciding whether preservation is proper in this case, we consider the impact of several decisions issued by our supreme court after Ritenour's trial. The jury returned its guilty verdict on November 19, 2014. On December 5, 2014, the supreme court decided three cases addressing expert testimony in cases dealing with allegations of child sexual abuse. *See State v. Brown*, 856 N.W.2d 685, 689 (Iowa 2014) (applying credibility principles); *Dudley*, 856 N.W.2d at 672 (applying credibility principles); S*tate v. Jaquez*, 856 N.W.2d 663, 665 (Iowa 2014) (applying credibility principles). The court reiterated Iowa's prohibition against experts commenting on witness credibility. *Brown*, 856 N.W.2d at 689 (stating *Dudley* reaffirmed the court's commitment); *see also Brotherton*, 384 N.W.2d at 378 (stating experts are not allowed to opine on the credibility or truthfulness of a witness). The *Dudley* court explained:

> [W]e continue to hold expert testimony is not admissible merely to bolster credibility. Our system of justice vests the jury with the function of evaluating a witness's credibility. The reason for not allowing this testimony is that a witness's credibility "is not 'a fact in issue' subject to expert opinion." Such opinions not only replace the jury's function in determining credibility, but the jury can employ this type of testimony as a direct comment on defendant's guilt or innocence.

856 N.W.2d at 676-77 (citations omitted).

A few months later, the court decided *State v. Tyler*, 867 N.W.2d 136, 166-67 (Iowa 2015), and concluded a medical examiner improperly testified that

in determining cause of death, he found some of the defendant's statements more credible than others.[4]

These four cases do not purport to establish new prohibitions on expert testimony. Instead, they reaffirm the court's commitment to the principle that an expert witness cannot give testimony that directly or indirectly comments on the credibility of a witness or victim. *See Tyler*, 867 N.W.2d at 154; *Dudley*, 856 N.W.2d at 676-77. But the new cases do establish some contours of when expert opinions legitimately assist the jury and when they cross the line. Given the more thoroughly developed case law in this area, we are inclined to preserve Ritenour's allegations of ineffective assistance of counsel so that her challenges may have a full airing in a postconviction proceeding.

In situations where the merit of a particular issue is not clear from Iowa law, we ask whether a competent attorney would have concluded the question was "worth raising." *See State v. Graves*, 668 N.W.2d 860, 881 (Iowa 2003). Our supreme court's decisions in *Dudley*, *Brown*, *Jaquez*, and *Tyler* lend support to Ritenour's position that objections to the expert testimony highlighted on appeal would have been "worth raising" by her trial attorney. As Ritenour notes on appeal, the prosecution did not have physical evidence linking her to the murder and did not offer the jury a clear theory pinpointing the time of death. Instead, the State focused on Ritenour's lack of credibility. Given that focus by

---

[4] Unlike *Tyler*, the instant case does not present uncertainty as to the child's cause of death. But Dr. Catellier did testify that when a witness provides a changing history of what happened before a child's death, she would view that as a "red flag" in determining that the death was nonaccidental.

the State, it was imperative for defense counsel to take the necessary steps to prevent the jury from hearing impermissible opinions regarding her credibility.

But we also entertain the possibility that counsel's failure to object could have been strategic. *See Brewer v. State*, 444 N.W.2d 77, 83 (Iowa 1989). Counsel might have believed the statements about credibility were better addressed through cross-examination and through Ritenour's own testimony. *See State v. Williams*, 334 N.W.2d 742, 745 (Iowa 1983) (finding failure to object may have been motivated by desire not to emphasize testimony).

For these reasons, we opt to preserve this ineffective-assistance-of-counsel claim so an adequate record may be developed in postconviction proceedings, and we decline to reach the merits of her claim the highlighted testimony was impermissible. *See State v. Coil*, 264 N.W.2d 293, 296 (Iowa 1978) ("Even a lawyer is entitled to his day in court, especially when his professional reputation is impugned.").

**Prosecutor's Closing Argument.** Ritenour next contends her attorney should have objected to comments about her credibility in the State's closing arguments. She points to this passage:

> Ladies and gentlemen, what is the easiest lie to tell? I didn't do it . . . . I didn't do anything. That is the easiest lie to tell, and the first thing that this person has gone back to over and over. Not me. I didn't do it. I can't tell you what happened. I don't know.

The prosecutor followed up by telling the jury:

> When you go back to judge that defendant's statements, you judge it the same way you do anybody else's. Who has the motive to lie? Who has been proven to have been caught in lies? Why does someone do that? Dr. Catellier told you, you know what, what is the red flag in a nonaccidental "I hurt my own child"? You tell a different story over and over and over.

Also in closing argument, the prosecutor discussed her cross-examination of Ritenour as follows:

> I wasn't throwing out questions that anyone couldn't understand. I was asking her about her interaction with her child the night before and the day her child was found dead. And then I heard, well, but, you know, she's just not very sophisticated. Ladies and gentlemen, you do not have to be sophisticated and you don't have to be good at telling lies to tell them.

Ritenour claims the prosecutor's references to lying constituted error[5] under the standard set out *Graves*, where the court held it was improper for the prosecutor to call the defendant a liar, say the defendant was lying, or make "similar disparaging comments." 668 N.W.2d at 876. But *Graves* does not foreclose a prosecutor from crafting an argument that includes reasonable inferences based on the evidence "when a case turns on which of two conflicting stories is true" and from arguing that "certain testimony is not believable." *Id.* (quoting *State v. Davis*, 61 P.3d 701, 710-11 (Kan. 2003)).

In deciding whether a *Graves* violation results in prejudice, courts must consider "(1) the severity and pervasiveness of the misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instructions or other curative measures; and (5) the extent to which the defense invited the misconduct." *Id.* at 877.

Ritenour argues the prosecutor's characterization of her statements as "lies" was "not isolated but repeated several times throughout the course of the

---

[5] Our supreme court recently explained its choice to use the term "error" rather than "misconduct" so as "to avoid automatically implying that the prosecutor violated our ethical rules." *State v. Martin*, ___ N.W.2d ___, ___ n.2, 2016 WL 1533515, at *5 (Iowa 2016).

closing argument." She also points out the State made her changing stories the central issue in the case. The State responds the evidence of Ritenour's "many diverging statements supported an inference that she lied." The State asserts the trial prosecutor did not convey a personal opinion about Ritenour's credibility and did not use inflammatory or disparaging language. *See State v. Carey*, 709 N.W.2d 547, 558 (Iowa 2006) ("It is not so much the fact that the prosecutor suggests the defendant is untruthful that creates misconduct . . . . [I]t is the use of the word 'liar' itself."). The State argues trial counsel had no duty to object because the prosecutor's closing argument was a permissible assessment of the evidence. And even assuming the prosecutor crossed the line, the State argues Ritenour cannot show a reasonable probability of a different outcome had trial counsel objected.

For many of the same reasons noted in our analysis of Ritenour's expert-testimony-on-credibility issue, we opt to preserve this claim of ineffective assistance for postconviction proceedings. The prosecution of Ritenour turned on her lack of credibility, and as such, we cannot discount the impact of trial counsel's failure to object to the State's repeated references to Ritenour telling "lies." But we do not rule out the possibility that counsel had legitimate reasons for not objecting during closing argument. *See Ondayog*, 722 N.W.2d at 787. Accordingly, development of the record is essential to resolving Ritenour's ineffective-assistance-of-counsel claims.

**Cumulative Effect of Trial Counsel's Errors**. Finally, Ritenour contends the cumulative effect of trial counsel's errors warrant a new trial. *See Clay*, 824 N.W.2d at 500. The State disagrees, arguing the evidence of her guilt "was more

convincing than her attempt to blame the murder on another suspect." When a defendant alleges multiple claims of ineffective assistance of counsel, the cumulative prejudice from the individual claims should be assessed under the prejudice prong of *Strickland*. *See id.* at 501. Thus, the postconviction court is required to look at the prejudice resulting from the entirety of any failures in duty by counsel. *Id.* In this case we have preserved Ritenour's three claims counsel was ineffective for a more fully developed record. Any cumulative-prejudice analysis must likewise await postconviction proceedings.

**AFFIRMED.**

Vaitheswaran and Potterfield, JJ., concur; McDonald, J., concurs specially; Danilson, C.J., dissents.

**MCDONALD, Judge.** (concurring specially)

I concur in the judgment; Ritenour's conviction should be affirmed. I write separately because the record is adequate to resolve Ritenour's ineffective assistance of counsel claim regarding the officers' testimony and the medical examiner's testimony.

I.

The Sixth Amendment to the United States Constitution provides "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The Supreme Court has made the Sixth Amendment applicable to the states via incorporation through the Fourteenth Amendment. To prevail on her claim, Ritenour must show (1) that her "trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice." *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). Failure to prove either element is fatal to the claim. *See State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003).

II.

I first address the question of duty. To determine whether counsel failed to perform an essential duty, we first decide if the representation dropped below an objective standard of reasonableness under prevailing professional norms. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014). The defendant must overcome a strong presumption of counsel's competence. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984). "In evaluating the objective reasonableness of trial counsel's conduct, we examine 'whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of

professionally competent assistance.'" *State v. Madsen*, 813 N.W.2d 714, 724 (Iowa 2012). "Miscalculated trial strategies and mere mistakes in judgment normally do not rise to the level of ineffective assistance of counsel." *See Lado v. State*, 804 N.W.2d 248, 251 (Iowa 2011).

## A.

Ritenour contends her counsel had a duty to object to certain testimony from law enforcement officers. She contends the officers improperly testified regarding her demeanor. For example, Lieutenant VanRenterghem testified he "just thought [Alicia's] demeanor [at the scene] was very strange" and "very odd for some body that just learned their child had passed away." Lieutenant Boston testified Rauch's and Cavan's demeanor did not "raise any red flags." Ritenour also contends her counsel had a duty to object to testimony regarding the inconsistent statements she gave to the police during the course of their investigation. Officer Schnitker testified that during his January 31 interview with Ritenour he became confrontational with her, which he explained is something he does "[i]f I don't believe your story." Officer Boston testified in "my experience dealing with people who have had a death in their family, especially a small child, they do everything they can to help you. They don't come in and tell different stories." The officers also provided some testimony assessing the consistency of Ritenour's different statements. Officer Boston testified that Ritenour's January 24 and January 25 statements were not "even close" to the same story. Officer Schnitker testified the January 24 and January 25 statements contained "[d]ramatic changes." Officer Boston testified that Ritenour "change[d] her story again" on January 31, though those changes were more minor "like she was

tweaking things a little bit."  Finally, Officer Schnitker testified there were "some pretty good changes" in Ritenour's subsequent October story.

Ritenour relies on *State v. Myers*, 382 N.W.2d 91 (Iowa 1986), and its progeny in support of her argument that the above-mentioned testimony was inadmissible.  In *Myers*, the defendant was charged with having indecent contact with an eight-year-old female victim.  *See* 382 N.W.2d at 92.  The prosecution called two expert witnesses to testify that child sex abuse victims generally tell the truth.  *See id.*  The question presented was whether the testimony was admissible pursuant to Rule 702, now Rule 5.702.  *See id.* at 93; *see also* Iowa R. Evid. 5.702.  The court concluded "that expert opinions as to the truthfulness of a witness are not admissible pursuant to rule 702."  *Myers*, 382 N.W.2d at 97.  The court reasoned the "expert testimony" crossed the line between an "opinion which would be truly helpful to the jury and that which merely conveys a conclusion concerning defendant's legal guilt."  *Id.* at 97-98.

Ritenour's reliance on *Myers* is misplaced.  *Myers* is limited to the very narrow issue regarding the use of expert witnesses pursuant to Rule 5.702 to bolster the testimony of witnesses.  *See State v. Barrett*, 445 N.W.2d 749, 752 (Iowa 1989) (allowing lay opinion testimony and distinguishing *Myers* on the ground it "involved expert opinion testimony on the credibility of a complaining witness who was a child and allegedly the victim of sexual abuse").  Subsequent decisions confirm *Myers* relates solely to expert opinion evidence offered pursuant to Rule 5.702 used to bolster credibility.  *See State v. Dudley*, 856 N.W.2d 668, 676 (Iowa 2014) ("[W]e continue to hold expert testimony is not admissible merely to bolster credibility."); *State v. Brown*, 856 N.W.2d 685, 689

(Iowa 2014) ("We again reaffirm that we are committed to the legal principle that an expert witness cannot give testimony that directly or indirectly comments on the child's credibility."); *State v. Jaquez*, 856 N.W.2d 663, 666 (Iowa 2014) ("However, when an expert witness testifies a child's demeanor or symptoms are consistent with child abuse, the expert crosses that very thin line and indirectly vouches for the victim's credibility, thereby commenting on the defendant's guilt or innocence."). The prohibition set forth in *Myers* regarding expert witness testimony to bolster credibility arises out of the inherent limitation of using general theory or data to opine on a witness's credibility in the individual case. *See Dudley*, 856 N.W.2d at 676-77 ("Moreover, when an expert comments, directly or indirectly, on a witness's credibility, the expert is giving his or her scientific certainty stamp of approval on the testimony even though an expert cannot accurately opine when a witness is telling the truth."); *State v. Pitsenbarger*, No. 14-0060, 2015 WL 1815989, at *8 (Iowa Ct. App. Apr. 22, 2015) ("We recognize the State's desire to present expert testimony to support their prosecution. However, our system of justice does not rely upon the statistical probabilities of certain conduct absent scientifically proven principles but rather relies upon the jury to determine the credibility of witnesses to reach its verdict."); *State v. Pansegrau*, 524 N.W.2d 207, 211 (Iowa Ct. App. 1994) ("There is a temptation to seek the help of persons who hold themselves out as experts in sexual abuse diagnosis and use their opinions in whole or in part to allegedly assist the fact finder in arriving at the truth. However, before any expert's evidence is used to assist a fact finder in arriving at the truth, it should be shown the expert's opinion provides reliable data. There was no evidence Leytham's

opinion had been generally accepted in the relevant scientific community as a means of detecting sexual abuse. The fact the alleged victim acted normally is not evidence she was sexually abused.").

The challenged testimony here is of a wholly different character. Here, the officers testified as fact witnesses based on their personal observations made during the course of their investigation and as fact witnesses offering lay opinion based upon personal knowledge. *See* Iowa R. Evid. 5.602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); Iowa R. Evid. 5.701 ("If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."). *Myers* and the line of cases on which the defendant relies are thus inapplicable here.

An officer's testimony regarding observed demeanor as a historical fact and lay opinion regarding the observed demeanor is relevant and admissible in Iowa. *See State v. Garcia-Miranda*, No. 05-1870, 2007 WL 1345848, at *7 (Iowa Ct. App. May 9, 2007) ("Unlike the expert witnesses in *Myers*, who testified that the children do not lie about incidents of sexual abuse, Officer Schwarz was not giving an expert opinion whether he believed Garcia–Miranda was telling the truth or lying. He simply described what he observed."); *State v. Hythecker*, No. 01-1048, 2002 WL 987966, at *3 (Iowa Ct. App. May 15, 2002) ("A defendant's demeanor and activities immediately following an alleged offense provide a

legitimate basis for inferring consciousness of guilt."); *State v. Glaus*, 455 N.W.2d 274, 276-77 (Iowa Ct. App. 1990) (allowing lay opinion regarding observed demeanor). Other courts reach the same conclusion. *See United States v. Fourstar*, No. 03-30121, 2004 WL 193245, at *2 (9th Cir. Jan. 30, 2004) (allowing testimony that complainant was acting immature for her age under Federal Rule of Evidence 701); *Greene v. State*, 673 S.E.2d 292, 299 (Ga. Ct. App. 2009) ("It is not improper bolstering, however, for a witness to testify as to their objective observations of the victim's behavior."); *Satterfield v. State*, 33 N.E.3d 344, 352-54 (Ind. 2015) (stating officer could give lay opinion regarding demeanor and credibility, which was helpful to the jury because the testimony gave "substance to facts, which were difficult to articulate"); *People v. Hanna*, No. 320268, 2015 WL 7366198, at *5 (Mich. Ct. App. Nov. 19, 2015) ("However, an individual's comments regarding a witness's 'responses and demeanor' do not constitute 'an expression of personal belief in the witness's credibility.'"); *State v. Daley*, No. 13-13-26, 2014 WL 2156621, at *13 (Ohio Ct. App. May 19, 2014) (holding it was not improper for detective to testify witness "did not display or demonstrate behaviors indicating that she was being deceptive" because it was within the scope of permissible lay opinion based on personal observation); *State v. Davis*, 545 N.W.2d 244, 247 (Wis. Ct. App. 1996) ("We conclude that the officer's statement that Thomas and Craft gave very good statements and were 'excellent witnesses' was not a comment on their credibility, but rather related to their demeanors. The officer's comments merely summarized his opinion of the witnesses and did not unfairly taint the fact-finding process. The credibility of a witness is something a lay juror can knowledgeably determine.").

Similarly, an officer can testify a person gave a statement or statements as a matter of historical fact and provide lay opinion on whether the statements were consistent or inconsistent or credible or not credible. *See State v. Blair*, 347 N.W.2d 416, 422 (Iowa 1984) (finding a defendant's inconsistent statements are probative circumstantial evidence from which a jury may infer guilt); *State v. Castile*, No. 14-0069, 2015 WL 360142, at *4 (Iowa Ct. App. Jan. 28, 2015) (distinguishing *Myers* where an officer explained he arrested the defendant after conducting interviews and concluding the "testimonies" of certain witnesses implicating defendant were consistent with the physical evidence and explaining the officer "was not testifying as an expert"); *State v. Smith*, No. 07-1406, 2008 WL 3916768, at *3 (Iowa Ct. App. Aug. 27, 2008) ("A defendant's inconsistent statements are probative circumstantial evidence from which the jury may infer guilt.); *Hythecker*, 2002 WL 987966, at *3 (stating "conflicting statements were additional evidence from which the jurors could infer guilt"). Such testimony does not invade the province of the jury because it is not an opinion regarding a witness's trial testimony or credibility, generally. Instead, it is a statement of historical fact regarding the officer's conclusions drawn during the course of the investigation and helpful to the jury in understanding the police's investigation. *See United States v. Churchwell*, 807 F.3d 107, 119 (5th Cir. 2015) (allowing testimony regarding interviewee); *Weeks v. Angelone*, 4 F. Supp. 2d 497, 533 (E.D. Va. 1998) (allowing testimony because it was "clear from the transcript, and would have been clear to the jury, that Rowland was merely stating what was in his mind at the time"); *State v. Gonzalez*, No. 1CA-CR11-0494, 2012 WL 3129136, at *1 (Ariz. Ct. App. Aug. 2, 2012) ("However, a police officer may,

under certain circumstances, testify as to why he does not believe a defendant's story."); *Robinson v. United States*, 797 A.2d 698, 707 (D.C. 2002) (allowing officer testimony that witness's statements were not consistent as statement of historical fact and not opinion on credibility because the statements explained the officer's investigation); *Gonzales v. State*, 95 So. 3d 1002, 1004 (Fla. Dist. Ct. App. 2012) ("Here, however, the police witness did not offer his opinion on the credibility of a witness. Officer Arocha merely testified that the two statements Montano and Riera gave were consistent. Specifically, Officer Arocha was asked to evaluate whether the witnesses' statements that he had personally perceived were similar. He did not opine on whether the witnesses or their statements were reliable. This kind of testimony by a police officer fails to constitute improper bolstering."); *Gordon v. State*, 541 S.E.2d 376, 382 (Ga. 2001) ("Agent Hughes did not comment on the credibility of either suspect; he merely explained that there were some variations in their statements. . . . Thus, the State did not elicit inadmissible opinion evidence."); *State v. Burtis*, No. 2008 KA 0373, 2008 WL 4332529, at *3 (La. Ct. App. Sept. 23, 2008) ("We find that Detective Eppinette's lay opinion testimony was based on her experience, observations, and interviews conducted and that it was helpful to the determination of a fact in issue. . . . Detective Eppinette was entitled to give her opinion as a lay witness as to her perception of the veracity of the victims' statements."); *People v. Wilson*, Nos. 300274, 300728, 2013 WL 2360239, at *5 (Mich. Ct. App. May 30, 2013) ("MRE 701 permits police officers to testify about their opinions and inferences based on their observations and rational perceptions as police officers where the opinions are not dependent upon scientific, technical, or specialized

knowledge."); *Hall v. State*, 16 S.W.3d 582, 586 (Mo. 2000) (allowing officer testimony that he did not believe interviewee's statements on the ground that it was not an opinion regarding a witness's credibility because it was an opinion regarding an out-of-court statement); *State v. Harper*, No. COA15-784, 2016 WL 609052, at *4 (N.C. Ct. App. Feb. 16, 2016) ("Our Supreme Court has determined that when one witness vouches for the veracity of another witness, such testimony is an opinion which is not helpful to the jury's determination of a fact in issue and is therefore excluded by Rule 701. However, our courts have also allowed a law enforcement officer to testify about her impressions of an interview subject for the purpose of explaining the subsequent course of the officer's investigation."); *State v. Biggs*, No. COA14-1349, 2015 WL 7729217, at *7 (N.C. Ct. App. Dec. 1, 2015) (holding officer can provide lay opinion regarding credibility assessments made during course of investigation); *State v. Houser*, 768 S.E.2d 626, 632 (N.C. Ct. App. 2015) (allowing officer's testimony that defendant's version of events was "inconsistent with" physical evidence because "these statements were rationally based on Lt. Helms's experience as a detective and were helpful to the jury in understanding the investigative process in this case"); *Robertson v. State*, No. 03-13-00381-CR, 2015 WL 4512481, at *4 (Tex. Ct. App. July 23, 2015) ("Officer Castillo's testimony, as phrased, is more properly characterized as an opinion about criminal investigations based on his experience and knowledge as an investigator rather than a direct opinion about the credibility of criminal defendants as a class; such lay opinions are generally admissible."); *Vanvorst v. State*, 1 P.3d 1223, 1234-35 (Wyo. 2000) (holding it

was not error where the officer did not express an opinion as to guilt but explained he did not believed the defendant's statement).

The Colorado Supreme Court provided a compelling explanation for the rule allowing such testimony:

> We hold that a detective may testify about his or her assessments of interviewee credibility when that testimony is offered to provide context for the detective's interrogation tactics and investigative decisions. The admissibility of any testimony hinges on the particular circumstances under which it is elicited and offered.
> . . . .
> In this case, the prosecutor elicited the challenged testimony with open-ended questions concerning the detectives' investigative interviews. The prosecutor did not use inflammatory or prejudicial words, such as "lie." His open-ended questions did not aim to elicit comments on the veracity of other witnesses' testimony but instead aimed to draw out the circumstances that surrounded the detectives' investigative tactics and decisions. The detectives' answers referred not to the credibility of the witnesses' in-court testimony, which determination undoubtedly falls within the jury's purview, but rather to the detectives' assessments of the interviewees' credibility during the interviews conducted prior to trial.
> Additionally, the detectives' testimony served an alternative purpose and yielded probative information. The detectives offered this testimony to explain their investigative decisions. It provided context for the jury to better understand the detectives' witness interviews and the scope of their investigation.

*Davis v. People*, 310 P.3d 58, 63 (Colo. 2013).

The United States Court of Appeals for the Third Circuit has also provided a compelling explanation for the rule:

> To be admissible under Rule 701, lay opinions must be (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. We afford broad discretion to the admission of lay testimony provided that it is well founded on personal knowledge and susceptible to specific cross-examination.

The District Court did not err in admitting this testimony. The WPD officers' testimony was rationally based on their personal perception of Dempsey's demeanor and the answers he gave during the interrogation, and involved no scientific, technical, or specialized knowledge. They explained the bases for their impressions about Dempsey's truthfulness, which was particularly helpful in this case because the jury did not view the videotape of the interrogation and thus could not see his body language or facial expressions or hear his tone of voice when he spoke to the WPD.

Furthermore, the WPD witnesses did not testify about Dempsey's overall veracity or propensity for truthfulness. Rather, their testimony was based only on his post-arrest interview during which he made inconsistent statements and spoke in circles. Moreover, Dempsey's counsel had the opportunity to fully cross-examine each of the WPD witnesses who interrogated him. . . . Under these circumstances, the District Court did not abuse its discretion in admitting the officers' testimony.

*United States v. Dempsey*, 629 F. App'x 223, 227-28 (3d Cir. 2015) (citations and internal marks omitted).

Because the officers' testimony was relevant and admissible, counsel had no duty to object. Ritenour's claim thus fails. *See State v. Lopez*, 872 N.W.2d 159, 169 (Iowa 2015).

B.

Ritenour also contends her counsel was ineffective in failing to object to the medical examiner's testimony regarding cause of death. Specifically, the medical examiner testified that, in determining cause of death for a child, one of the facts that may distinguish an accident from an inflicted injury is whether the story of those providing information changes over time.

There is nothing objectionable to the testimony, generally. *See Smith*, 2008 WL 3916768, at *4 ("In addition to all of the discrepancies in Smith's explanations of how the injuries occurred, many of the medical experts who treated Gabriel testified they believed Smith's explanations to be inconsistent

with the nature and extent of the injuries, which included four fractures and a dislocation to three separate bones in one arm. Dr. Suriar testified at trial that it 'was not easy to really connect the story with the injury. The degree and the severity of the injury, it raised our suspicion.'"). The doctor's testimony in this case did not cross the line between the permissible and impermissible and specifically identify Ritenour as the person inflicting an intentional injury on the child or otherwise provide an opinion on Ritenour's guilt or innocence. The supreme court's most recent decision in this area does not disallow the testimony. *See State v. Tyler*, 867 N.W.2d 136, 162 (Iowa 2015) ("Having surveyed the authority on the issue, we conclude there are circumstances when a medical examiner's opinions on cause or manner of death may assist the jury, even when such opinions are based in part on witness statements or information obtained through police investigation.").

Because the medical examiner's testimony was relevant and admissible, counsel had no duty to object. Ritenour's claim thus fails. *See Lopez*, 872 N.W.2d at 169.

III.

I next address the question of prejudice. The ultimate inquiry is whether trial counsel's allegedly deficient performance caused a complete "breakdown in the adversary process" such that the conviction is unreliable. *See Strickland*, 466 U.S. at 687. This requires the defendant to establish "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lamasters v. State*, 821 N.W.2d 856, 866 (Iowa 2012) (quoting *Strickland*, 466 U.S. at 694).

Even if counsel had a duty to object, I would hold that Ritenour has failed to establish *Strickland* prejudice. First, within the context of the entire trial, the challenged statements were "relatively isolated." *See Kindschuh v. State*, No. 04-0990, 2005 WL 724465, at *4 (Iowa Ct. App. Mar. 31, 2005). Second, the statements regarding the inconsistency in Ritenour's statements were cumulative to other admissible evidence—Ritenour's three statements regarding the incident were, in fact, very different from each other. *See State v. Rice*, 543 N.W.2d 884, 887 (Iowa 1996); *State v. Brotherton*, 384 N.W.2d 375, 379 (Iowa 1986); *State v. Gilmore*, 259 N.W.2d 846, 858 (Iowa 1977); *State v. Thomas*, No. 98-2268, 2000 WL 373788, at *3 (Iowa Ct. App. Apr. 12, 2000) ("Prejudice is not established by the admission of objectionable evidence where substantially similar evidence has been admitted without objection."). Third, and related, the officer's testimony regarding the consistency of the statements and demeanor did not provide "any information other than common sense or information known to jurors from their common experiences." *See Willock v. State*, No. 13-0997, 2014 WL 7343215, at *12 (Iowa Ct. App. Dec. 24, 2015) (holding there was no prejudice where officer may have vouched for credibility of the complainant). The jury was well-positioned to make an independent determination of whether the statements were consistent and whether Ritenour, Rauch, or Cavan demonstrated odd or concerning demeanor. Unlike *Myers*, there was not an imprimatur of scientific authority bolstering the testimony and placing it outside the understanding of the lay jury. Fourth, the testimony was not prejudicial because defense counsel had the opportunity to effectively cross-examine the witnesses regarding these statements. *See State v. Brown*, No. 2014-L-037, 2016 WL 1290940, at *9 (Ohio

Ct. App. Mar. 31, 2016) (holding no plain error where officer who provided opinion testimony on defendant's truthfulness was cross examined and neutralized). Finally, Ritenour testified at trial, and the jury was able to assess her credibility first-hand. *See, e.g.*, *Kindschuh*, WL 724465, at *3 (holding there was no prejudice where expert did impermissibly render an opinion on the credibility of the child victims in the case because it was "significant that both children testified at trial," which "allowed jurors the opportunity to assess, based on their first-hand observations, the credibility of the children"); *See also Harper*, 2016 WL 609052, at *5 (holding it was not plain error where officer provided lay opinion regarding credibility where the jury was able to view the witness live). Seeing the witness first-hand "had the effect of blunting or minimizing the significance" of the allegedly improper testimony. *See Kindschuh*, 2005 WL 724465, at *3.

IV.

I see no reason to preserve the defendant's claims regarding the challenged testimony for postconviction-relief proceedings. Iowa law holds that the officer's challenged testimony was admissible. Iowa law holds the doctor's testimony was admissible. Counsel had no duty to make a meritless objection. *See Lopez*, 872 N.W.2d at 169. In addition, there was no constitutional prejudice suffered in this case. I would resolve the defendant's claims on direct appeal and affirm the defendant's conviction.

**DANILSON, Chief Judge.** (dissenting)

I respectfully dissent. I believe the district court erred in excluding evidence of Logan Cavan's methamphetamine use a few days before the child's death and subsequent "crash" and withdrawal symptoms from the time of his use to the child's death. There was no need for expert testimony as Cavan admitted to sufficient facts to aid the jury in his deposition testimony. Such evidence was critical to Ritenour's defense. The purpose of such evidence was not to show Cavan's propensity for wrongful acts but to prove motive and explain the cause for Cavan's abnormal hostility towards the child. The evidence would permit Ritenour to show Cavan's continuous conduct leading to the child's death as she claims. If the circumstances were different and Cavan faced prosecution for the child's death, the State would certainly be seeking admission of the same evidence and would likely claim it was inextricably intertwined with the act causing the child's death. Yet here, the State complains when the defense wishes to convey the whole story. Such evidence is not prohibited by Iowa Rule of Evidence 5.404(b) and is more probative than prejudicial and thus admissible under rule 5.403. I would reverse for a new trial and find it unnecessary to address the issue of ineffective assistance of counsel.